SLOAN, Special Administratrix, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*December 12, 1912—January 7, 1913.*

*Appeal: Questions of fact: Weight given to decision of trial judge: Special verdict: Changing answers: Evidence: Sufficiency: Railroads: Negligence: Death of switchman.*

1. Because of the superior opportunity of the trial judge for reaching a right conclusion, his decision as to whether there is a jury question for solution will not be disturbed on appeal unless manifestly wrong.

2. Plaintiff's intestate, while in charge of a switching crew in defendant's yards, was run down and killed by cars which ran upon the wrong track because of the failure to turn a switch. Upon evidence showing that it was the duty of the deceased on this occasion to turn the switch and to give the signals for the movements of the cars, and that up to the time he stepped into the region of danger and was killed the movements of the cars were under his personal direction, it is *held* that the trial court was warranted in changing findings in the special verdict to the effect that negligence of other members of the crew directly contributed to the death, and in dismissing the action.

3. The special verdict having been thus changed so as to negative the existence of negligence on the part of any one except the deceased, it is immaterial that the trial court did not formally set aside or change other findings by the jury to the effect that it was the duty of one of the other men to turn the switch (which finding was contrary to all the evidence), and that the negligence of the deceased was slighter as a contributing cause to the injury than that of the other switchmen.

4. In such a case judgment might have been given in favor of defendant notwithstanding the verdict, without changing any of the findings therein; but the usual and better practice is to shape the verdict so that on its face it forms a basis for the judgment.

    TIMLIN and KERWIN, JJ., dissent.

APPEAL from a judgment of the circuit court for La Crosse county: E. C. HIGBEE, Circuit Judge. *Affirmed.*

Action to recover compensation for damages caused to the widow of Frank Sloan, by his death, alleged to have been pro-

duced by negligence of defendant's servants. Issues were duly joined. All conditions precedent to the right to maintain the action were alleged and admitted or proved.

The evidence established as facts, the following: In the nighttime of September 9, 1909, while the intestate was on duty in defendant's yards at La Crosse, Wisconsin, in charge of a switching crew he was run down and killed by cars which were being moved under his direction. Besides the engineer and fireman there were two men associated with Sloan, Mr. Kessler, as head brakeman, and Mr. Hawkins, as rear brakeman. It was a dark, foggy night. Because of such condition Kessler was stationed rather nearer the engine than usual so he could readily receive signals from Sloan and repeat them to the engineer. It was Hawkins's duty to ride the rear cars and as they were, from time to time, spotted to set the brakes. Because of fog and darkness Sloan assumed the duty of throwing the switch for the movements leading up to the accident. The engine was operating "head on" with a string of cars and a caboose. There were several sidetracks, substantially parallel with a main track, and connected therewith, directly or indirectly. Just prior to the particular movement the engineer executed orders to set a caboose in on what was known as track 1. Failing to do so efficiently by the first effort, there was a return and the caboose was "kicked" on to a satisfactory clearance. Hawkins rode the caboose to its position and set the brakes. Sloan was in front of the caboose or between it and the particular switch. Kessler was on the moving cars, toward the engine, where he could receive and transmit signals as before indicated. The movement next to be executed, according to Sloan's orders was to recede to a clearance of the switch to track 1 and that to track 4, and then return and push the cars in on the latter, the switches being properly turned for that purpose. By inadvertence they were not turned so as to direct the cars in on track 4 but were left so as to give direction back in on track 1.

Sloan gave the signals for the return movement. They were received by Kessler and repeated to the engineer. Hawkins about this time descended from the caboose and, after having some altercation with a trespasser near by, passed over toward track 4,—the one on which the cars were expected to come. Sloan was near the particular switch just before the return movement of the cars. Kessler was some distance away on the moving cars and some six car lengths from the rear. On account of the conditions, he could not see Sloan's person but could see his lantern. He could not see definitely, what track the cars were on. His attention was directed to receiving the signals from Sloan and repeating them to the engineer. The initial signal for the return movement was given by a person standing near the particular switch. There was no other person at that point except Sloan. After such initial signal, others were given for a continuance of the return movement, the person giving them, at the same time going in the direction the cars were moving and on or near track 1. Soon after the last signal was given, he disappeared and soon thereafter Hawkins, who had observed him step into the pathway of the coming cars, a short distance therefrom and endeavored, but too late, to arouse his attention to the peril, succeeded in efficiently signaling for the movement of cars to stop. Sloan was found dead about where Kessler had seen his lantern disappear after the last signal to come on was given. About the time Sloan was seen at the switch he had some altercation with a trespasser on the track, presumably the same one who had attracted the attention of Hawkins.

Upon the theory that the evidence tended to show that Sloan came to his death by reason of his own carelessness and that, if there was any efficient negligence on the part of his associates it was either in the conduct of Kessler or Hawkins, and with the firm conviction, as stated by the judge, that there was no warrant in the evidence for a finding of such negli-

gence, the cause was submitted to the jury for answers to special questions, resulting in substantially these findings, among others, in the whole, if warranted by the evidence, entitling plaintiff to recover: Kessler was guilty of want of ordinary care proximately causing the death of Sloan. Hawkins was also guilty of such want of care. Sloan was guilty of efficient contributory fault. His want of care was of lesser degree than that of the trainmen. It was Hawkins's duty to turn the switch.

Upon motion the trial court changed the finding as to negligence of Kessler and also as to negligence of Hawkins, characterizing the reversal by a decision to the effect that there was no warrant for the finding that it was the latter's duty to turn the switch, and ordered judgment dismissing the action with costs, which was accordingly rendered.

For the appellant there were briefs by *A. E. Bleekman* and *Frank Winter,* and oral argument by *Mr. Winter.*

For the respondent there was a brief by *C. H. Van Alstine, H. J. Killilea,* and *Paul W. Mahoney,* and oral argument by *Mr. Killilea.*

MARSHALL, J.    It does not seem best to review the evidence here, in detail, to demonstrate the correctness of the conclusion to which we have arrived. The statement of facts sufficiently justifies that. It indicates that the opinion which the trial judge had at the close of the evidence was well grounded. On the motion to correct the verdict and for judgment in respondent's favor, he carefully reviewed the evidence; showing that it was the duty of Sloan, and of no one else on the particular occasion, to turn the switch; that it was his duty, and that of no one else, to give the signals for the movement of cars; that he, and no one else, gave the signals, and that the movements, up to the time he stepped into the region of danger and was killed, were under his personal direction.

From the nature of the case, the rule applies, very strongly, that in determining whether there is a jury question for solution the trial judge has such superior opportunity for reaching a right conclusion as to the matter of fact involved,— that is as to whether there is room in the evidence for a determination to a reasonable certainty in either of two ways, that his decision is entitled to such weight on appeal as not to be legitimately disturbable without a manifest showing of its being wrong. The mere fact, looking at the printed record alone, that we would incline to a different view, is not sufficient. The weight of superior opportunity below to discover the right of the matter, would still bear down the scales in favor of the decision complained of. All reasonable doubts arising from the record itself, and those arising from appreciably contemplating the peculiarly advantageous position of the trial judge, must be overcome, in such a case as this, in order to successfully challenge the initial decision. As has been said, over and over again, that dignity is due to the decisions of trial judges on matters of fact. The letter and spirit of our system of jurisprudence demands and commands it. Justice, in general, will be most certainly effectuated by this court firmly adhering to such rule. Such a course will give courage and stimulus to trial judges to perform the whole duty of their high office and shape litigation speedily, directly, economically, and certainly as practicable, to a finality. Any other course would strongly tend to weaken trial jurisdictions where there is most need of executive strength and judicial courage.

Testing the record before us by the rule indicated, we fail to discover any fair ground for disturbing the judgment appealed from. We come far short of being able to say the court below was wrong in deciding that there was no evidence of negligence on the part of either Kessler or Hawkins. The fact that the finding as to Hawkins's duty to turn the switch was not formally changed or set aside, is immaterial. The

erroneous notion entertained by the jury, if they intelligently considered the matter at all, that Hawkins was negligent must have been grounded on the theory, which is not only without support in the record but contrary to all the evidence on the subject,—that it was his duty to turn the switch. Therefore the change of one in effect changed the other; and, in any event, the court might have granted judgment in defendant's favor, notwithstanding the verdict, without changing any of the answers; though to first shape the verdict so as, on its face, to form a basis for the judgment, is the usual practice and is the formal, if not the best, though not essential way. What is said on this subject applies to the fact that the finding as to the negligence of Sloan being slighter than that of the trainmen was not changed. The change so as to negative there having been negligence of any one but Sloan, carried with it the comparative found feature of his negligence. Moreover, his fault, in the judgment of the trial court, appeared conclusively from the evidence, leaving the jury finding in the case, really immaterial.

*By the Court.*—Judgment affirmed.

The following opinion was filed January 28, 1913:

TIMLIN, J. (*dissenting*). If I could make myself believe that "because of the fog and the darkness Sloan [decedent] assumed the duty of throwing the switch for the movements leading up to the accident," I would have no difficulty in agreeing with the majority opinion in this case. The case turns upon this point of fact. Although of opinion that the evidence was insufficient to support a verdict for plaintiff, the trial court submitted the case to the jury, who found by special verdict that plaintiff's decedent, Frank Sloan, and his two associate switchmen, Kessler and Hawkins, were each guilty of negligence directly contributing to the injury and death of Sloan, but that the negligence of Sloan was slighter.

The jury also found that it was Hawkins's duty to see that the switch in question was properly turned at the time and place in question, and that the decedent did not give the signals for the moving of the train immediately prior to the injury which resulted in his death. This verdict would, under the statute in force, have entitled plaintiff to judgment for the damages of $2,000 found. But the learned circuit judge changed the answers of the jury so as to say that the negligence of the deceased was greater, and so as to say that it was Sloan's duty to see that the switch was properly turned, and upon the verdict thus changed gave judgment for defendant.

Sloan was foreman of the switching crew, which, excluding the engineer and fireman, consisted of Sloan, Kessler, and Hawkins. The only eye-witnesses were one Harry Gifford, an employee of defendant but not a member of Sloan's crew, and Kessler and Hawkins. The injury occurred at 11:40 p. m. and the night was dark and foggy. A series of quite parallel switch tracks lay northerly of the main track and extended with it northeasterly and southwesterly. The witnesses refer to the first as "east" and to the second as "west." That track next northerly of the main track is known as track 1; next north of this is track 2; next north of this lie tracks 3 and 4 in the order named. There are other tracks substantially parallel with and north of track 4 and other tracks south of the main track, but they cut no figure in this case. It is seven and one-half feet from the north rail of track 1 to track 2, six feet between tracks 2 and 3, and seven feet between tracks 3 and 4, all at a point opposite the switch shanty which is called in the evidence Camp 20. Southwesterly of Camp 20 these tracks connect with switches. The distance from switch 1 northeasterly to Camp 20 is 200 feet. Switch 1 connects track 4 with track 1. The distance from switch 1 northeasterly to switch 2 is ninety feet. Switch 2 connects track 4 with track 2. The distance northeasterly from switch 2 to switch 3 is eighty-nine feet. Switch 3 con-

nects track 4 with track 3. It will thus be seen that between tracks 1 and 4 are tracks 2 and 3, the southwesterly end of track 4 forming what is called in railroad parlance a lead for tracks 2 and 3; that with switch 1 open for track 4, cars would be shunted from track 1 onto track 4; moving along that track ninety feet they would encounter switch 2, which if opened for track 2 would shunt the cars onto track 2; but if switch 2 was not opened, moving along further northeasterly eighty-nine feet on track 4 they would come to switch 3, which if opened for track 3 would shunt the cars into track 3. Sloan was found lying dead directly south of the switch shanty, with his right leg and arm on the north rail of track 1, his lantern on the platform of the caboose, which had been backed down on track 1 northeasterly of where his body was. He had his train lists in his dead hand.

The train movements preceding the injury were as follows: A switch train with thirteen or fourteen cars and a caboose was on track No. 2 and desirous of putting some of these cars but not the caboose on track 4. They desired to put the caboose on track No. 1. The caboose was the last or rear car. To do this they pulled southwest, passed over the switch connecting track No. 2 with track No. 4, over track No. 4 to switch No. 1, connecting track No. 4 and track No. 1, and far enough southwest on track No. 1 to clear switch No. 1, and then far enough northeast so as to back the caboose in on track No. 1 past switch No. 1 and uncouple it. It required three moves to do this: one movement to the southwest on tracks 2, 4, and 1 over switches 2 and 1, then one movement to the northeast on track No. 1, then uncoupling the caboose, then a "kickback" to the northeast so as to cause the caboose to clear the other cars which might come in on the switch track. Having got the caboose down on track No. 1 to a point about due south of Camp 20, they pulled southwesterly again along track No. 1 far enough to clear switch No. 1, and backed in on signals believing that switch

No. 1 had been thrown and that they were backing in on track No. 4, but instead backing in directly on track No. 1, where they struck and killed Sloan.

It is very obvious that the neglect to throw switch No. 1 for the last backward or northeast movement and so shunt the cars onto track 4 was the negligent act which caused the injury in question. If we were to accept the words of the switchman Kessler without discrimination, the decision of the trial court might be sustained, because he said Sloan told him *just before they pulled out over No. 2 switch* that he, Sloan, would turn switch No. 1. But there is also other evidence, and therein lies the error in taking this case from the jury. This evidence consists of the circumstance that Sloan was found dead on track No. 1 clutching his train sheets in his hand and with his lantern resting on the southwesterly platform of the caboose. Next, of the testimony of Harry Gifford, who sat in the door of Camp 20 looking toward Sloan and part of the time talking with him, and about seventy-five feet distant. He testifies:

"Sloan stayed there by the caboose when the train went west. He and I joshed back and forth, talking. He was looking over his list. His lantern was either on his arm or on the platform of the caboose. The train pulled west on number 1 track. Sloan gave no signals. This caboose was in front of the shanty. Sloan hollered to the rest of the crew to come down either 2 or 4 track, I couldn't say which. After he called he stayed right by the caboose. He was standing there, and then I saw the cars coming back there on number 1 track. Then I saw him get killed. At the instant he got killed I put my hands to my ears. I thought he was going to holler."

There are some contradictions and some discrepancy between this testimony and that which he gave at the inquest, but nothing to take the question of his credibility from the jury. Gifford further testified that the first he saw of Hawkins the latter was walking northwest toward Camp 20 after

the accident, coming from the southeast. This was not coming from the direction of track 4. Kessler, for the defense, testified that he was head brakeman and Hawkins rear brakeman; that Sloan told them to take the caboose out of track No. 2. They then went west, the engine facing east, and Sloan gave the signal to him to stop when they pulled out from No. 2 west. Sloan then went west across No. 1 track— to throw the switch he supposed.

"If it had been a clear night it would have been my business to throw that switch, but he told me to stay with the engineer where he could see me and he would take care of the switches. I moved near enough to the engineer for him to see my signals. Sloan ought to have thrown that switch. Sloan gave me a signal to go ahead two or three car lengths. First he gave a high ball. I gave them to the engineer. Frank was about seven or eight car lengths from me at that time. The engine then moved east. Sloan said he would throw the switch *when he was right up to the engine coupling on No. 2. He then started to walk east on track No. 2.*"

It will be observed that walking east on track No. 2 was walking away from switch No. 1. It will also be observed that Mr. Kessler entirely omits the forward-and-back movement which they made after leaving track No. 2 with the caboose for the purpose of putting it on track No. 1, and the second back movement on track No. 1 for the purpose of kicking the caboose northeasterly to clear the switch. Now, if at the time they moved out of track No. 2 Sloan said he would throw the switch, he evidently did throw the switch, because after that they had deposited the caboose on track No. 1, and that could not have been done unless the switch was thrown for track No. 1. So it is evident the testimony of this witness does not relate to the movement which resulted in the death of Sloan, but to a prior movement, and that he is concealing something. He continues:

"The last I saw of Sloan he gave me a car-length signal about four or five minutes before he was killed. The cars

kept moving right along. We went one or two car lengths after Hawkins gave me the signal to stop. Hawkins came from the north. . . . After Sloan said he would throw the switch he walked east down No. 2 track. I was on the ground. At the time we pulled across the switch Sloan was nearer."

From this it is apparent that both of these men were near the switch No. 2, both on the ground, and that Sloan proceeded east, which was away from switch No. 1, and that the other man, if he followed his train westwardly, passed switch No. 1. On cross-examination he explains that he did not see Sloan give signals, but saw the lantern signals and thinks Sloan gave them. That the person who gave him the highball signal to come ahead was at switch 1 where he went across. He testifies that he last saw Hawkins on track No. 2 before the accident when they pulled out from that track, and did not see him again until the accident. Hawkins was then on track No. 2, about ten car lengths from switch 2, and walking east. He reiterates that Sloan told him that he, Sloan, would throw switch 1 *just before they pulled out over switch 2.* They were to come over No. 2 switch and over No. 1, and No. 1 switch was to be turned and Sloan turned it. This, I think, shows that he is not talking about the movement made at the time of the injury, but a prior movement. He says:

"We pulled west out of track No. 2 and backed the caboose on track No. 1. It would not clear, and then we shoved against it again and thought it cleared. Then he gave me the signal to go west over switch 1. *I thought he would turn the switch so we would go down on lead 4.* Instead of this we went back on No. 1 track."

As I understand this testimony, it does not contradict that of Gifford, and the statement of Sloan that he would turn the switch related to the first movement to move the caboose from track No. 2 onto track No. 1. That the switch was turned and this movement was made, and a second movement to kick

the caboose back further so as to clear the switch, and then another southwesterly movement, and then the last and fatal movement, is beyond dispute.

Now it cannot be said that because Sloan, on the first movement, told Kessler he would throw switch No. 1 to make the connection necessary to place the caboose on track No. 1, that he would continue to throw switch No. 1 for any future movement. Having got the caboose at the desired place he gives orders to his men to put the other cars on track No. 4 and applies himself to an inspection of his train sheets. These men then scatter. Kessler goes west, either riding or walking, passing over switch No. 1; Hawkins, according to his story, goes north to No. 4 track to open the knuckles on the cars there, and the train, after clearing No. 1 switch, and without knowing whether it has been turned or not, backs in again on No. 1 track upon Sloan while he is engaged in examining his train sheets. Kessler testifies to facts which would indicate that the signals for the last northeast movement, which resulted in Sloan's death, were given by Sloan. Gifford, who was watching Sloan at the time and talking with him, says Sloan gave no signals. The fact that Sloan stood right in the path of the train examining his train sheets by the light of his lantern is strong evidence to show he did not think the train was backing in on that track. If he gave the signals he must have understood that switch No. 1 was open for track No. 4. He knew he had not opened it. If he did not give the signals, as Gifford testifies, then Hawkins gave the signals and gave them recklessly, without reference to whether switch No. 1 was turned for track No. 4 or track No. 1.

The case is not very large or very important, but after a man's lips are closed in death I do not like to see his legal rights sworn away by the suspicious testimony of survivors interested in exonerating themselves. I think under the circumstances the evidence should be carefully scrutinized, and

a careful scrutiny of this evidence convinces me that there were facts in controversy determinative of the case upon which a jury should have been allowed to pass. I think any experienced railroad switchman would unhesitatingly say that when a switching foreman, after having thrown a switch, walks away from it, and after the cars are thrown in to the required track and the foreman then gives another order to his men to put cars in on another track, such latter order includes passing beyond the switch so as to clear it and throwing the switch for that other track. I think that is what the evidence shows was done in this case.

I cannot assent to the correctness of the following in the opinion of the court:

"All reasonable doubts arising from the record itself, and those arising from appreciably contemplating the peculiarly advantageous position of the trial judge, must be overcome, in such a case as this, in order to successfully challenge the initial decision."

As I understand this, it means to say that the decision of the trial court changing the answer of the jury to one or more questions of a special verdict must be affirmed, unless the contrary appear beyond all reasonable doubts growing out of or suggested by the printed evidence or by considering the advantage which the circuit judge had in seeing and hearing the witnesses and observing their demeanor and manner of testifying. I do not think such weight can be given to the decision of the court below upon what is in legal effect a demurrer to evidence, without invading the constitutional right of the suitor to a trial by jury.

In *Klein v. Valerius,* 87 Wis. 54, 57 N. W. 1112, a statute was held unconstitutional which attempted to make it the duty of this court to review all questions of law or fact presented by the record upon appeal or writ of error and to examine and review the evidence when the same is preserved by a bill of exceptions and give judgment upon the right of the

case, regardless of the decisions upon questions of fact or law made by the court below.    It was suggested that the determination of questions of fact must remain as at the time of the adoption of the constitution, citing *Callanan v. Judd,* 23 Wis. 343.    Sec. 5, art. I, Const., secures the right of trial by jury in civil cases.    *Bennett v. State,* 57 Wis. 69, 14 N. W. 912. Where the question of negligence is of a mixed character, one of law and fact, it must be left to the jury.    *Patten v. C. & N. W. R. Co.* 32 Wis. 524.    Mixed questions of law and fact are to be submitted to the jury under proper directions.    *Bass v. C. & N. W. R. Co.* 36 Wis. 450.    Where conflicting and indecisive evidence is given upon questions of fact it is for the jury to determine its force and effect.    *Saunderson v. Lace,* 2 Pin. 257.    Where there is evidence for each party upon a material point, though positive upon the one side and indefinite upon the other, the weight of such evidence is a question for the jury.    *Calder v. Crowley,* 74 Wis. 157, 42 N. W. 266.    This is also the rule where the solution of the question depends upon circumstantial evidence.    *Agnew v. Farmers' Mut. P. F. Ins. Co.* 95 Wis. 445, 70 N. W. 554.    The mere fact (as shown by the record in this case) that the trial judge believes that if a verdict should be rendered for the plaintiff in a personal injury case it ought to be set aside as against the weight of evidence, does not justify him in withdrawing the case from the jury.    *O'Brien v. C. & N. W. R. Co.* 92 Wis. 340, 66 N. W. 363.

Many such cases might be cited, and in the early history of this court this command of the constitution lay with serious and heavy control upon the judges of this court.    As a logical consequence of this view there obtained also the rule that a motion for a nonsuit presented a question of law, the facts being admitted with all their proper effect in law (*Hunter v. Warner,* 1 Wis. 141), and that a nonsuit for insufficiency of evidence could be granted only where there was no evidence which upon the most favorable construction it would

bear and no inferences of fact capable of being logically drawn therefrom which would justify the jury in finding for the plaintiff. *Douglass v. Garrett,* 5 Wis. 85; *Johnston v. Hamburger,* 13 Wis. 175; *Jarvis v. Hamilton,* 19 Wis. 187; *Sutton v. Wauwatosa,* 29 Wis. 21; *Gower v. C., M. & St. P. R. Co.* 45 Wis. 182; *Schomer v. Hekla F. Ins. Co.* 50 Wis. 575, 7 N. W. 544; *Imhoff v. C. & M. R. Co.* 22 Wis. 681; *Houfe v. Fulton,* 29 Wis. 296.

Many other cases might be cited. The first invasion of these rules is found, I think, in *Powell v. Ashland I. & S. Co.* 98 Wis. 35, 38, 73 N. W. 573. While professing to follow the prevailing rule of law above referred to, several qualifications are added. The legal effect of evidence is to be measured by a new standard, that is, it must, in order to be taken from the jury, be so clear and conclusive as not to admit *reasonably* of any opposing inferences in *unbiased and unprejudiced minds.* There is an element of confusion in the rule thus stated and an *argumentum ad hominem* which enables the court applying the rule to easily dispose of cases on the ground that those differing did not possess the unbiased and unprejudiced mind. But this apparently easy avenue of escape for one who had the ultimate disposition of a controverted question failed or reduced itself to absurdity when the tribunal of last resort divided upon the question, as in *Agen v. Metropolitan L. Ins. Co.* 105 Wis. 217, 224, 80 N. W. 1020; *Sparks v. Wis. Cent. R. Co.* 139 Wis. 108, 120 N. W. 858; *Zabawa v. Oberbeck Bros. Mfg. Co.* 146 Wis. 621, 131 N. W. 826; and other cases. A decision under the rule stated does not decide the case, but merely decides our moral and mental superiority over those who differ with us as to the probative effect or proper inferences to be drawn from facts.

When one person or tribunal decides upon given evidence that it contains nothing either by way of direct proof or logical inference to support a stated conclusion, and another undertakes to review and reverse that decision, the latter

must point out the error and show the items of direct proof or logical inference which have been overlooked or undervalued by the first decision. But no such thing is necessary if the rule is so modified as to permit the reviewer to bolster up his own argument by determining that he was intelligent, unbiased, and unprejudiced, while all who differed with him lacked those high qualities. But the decision in *Powell v. Ashland I. & S. Co., supra,* did not stop here. It undertakes to add to the existing rule, and declares that, while we must give the evidence and the logical inference therefrom this effect most favorable to the person nonsuited and consequently against the decision, we must give the decision such weight that it cannot be disturbed unless against the clear preponderance of the evidence. This is impossible, contradictory, and most confusing. No one can reconcile these two rules. The preponderance of evidence has been defined, and it has been often said that that evidence preponderates which is the most credible and convincing. *Parker v. Hull,* 71 Wis. 368, 37 N. W. 351. I do not attach great weight to judicial definitions except as they affect the particular case. It is not a judicial function to define the meaning of a word as applied to all cases, and judicial definitions from this viewpoint are more frequently wrong than right, except when they perform the idle office of copying from the current dictionaries. But the words "preponderance of evidence" naturally and ordinarily refer to a question of fact, *i. e.* the difference in convincing power between two opposed probative tendencies. If there could be any doubt on this, it must be dissipated by the further language of the court in *Powell v. Ashland I. & S. Co., supra:*

"The opportunities which a trial court has for determining such questions are superior to those possessed by the appellate court, and on that ground are entitled to considerable weight, and, where the question is doubtful, to controlling weight."

This language is applicable only to questions of fact arising in the court below, and the expression, "where the question is doubtful to controlling weight," is in direct contradiction of that part of the rule as stated in the same case, which declares that "unless the proof of contributory negligence is so clear and decisive as to leave no room for unbiased and impartial minds to come to any other conclusion, . . . the proper inference to be drawn must be determined by the jury." Upon this background of confusion in thought and language this court has attempted for some years to sketch a plan of procedure to guide professional men, inferior courts, and itself. It has succeeded in proving under this rule, in *Agen v. Metropolitan L. Ins. Co.* 105 Wis. 217, 80 N. W. 1020, that either three of the judges of this court, or else two of the judges of this court plus the circuit judge and the jury, did not possess unbiased or unprejudiced minds. Very many conflicting and confused statements of this alleged rule are thereafter to be found in the reports. In *Turtenwald v. Wis. Lakes I. & C. Co.* 121 Wis. 65, 98 N. W. 948, where the ruling of the circuit court directing a verdict for defendant was reversed, the rule was softened down as follows:

"Ordinarily a trial judge in deciding whether the evidence in any reasonable view of it will support a verdict in favor of the plaintiff has some advantages over an appellate court, and that such circumstance, in doubtful cases, is entitled to considerable weight upon appeal."

There will also be found the aggressive and militant form of the rule, as in *Clemons v. C., St. P., M. & O. R. Co.* 137 Wis. 387, 391, 119 N. W. 102, where it is said:

"A conclusion of a trial court, respecting sufficiency of evidence as to any fact in issue to present a jury question, should not be disturbed unless it appears from the record to be clearly wrong, giving due weight to the superior advantages which such court has *for discovering the truth.*"

This alleged rule has been stated in many ways,. differing not only in form but in substance, and sometimes without distinction of the question presented. When the trial court has decided that there is evidence sufficient to take the case or the question to the jury and the jury has decided affirmatively or negatively on that question, and it is sought to review the said ruling of the trial court in this court, the double-headed rule declared in *Powell v. Ashland I. & S. Co.* 98 Wis. 35, 73 N. W. 573, could be logically applied, leaving out the personal element; because in that case the rule which entitles one to a jury trial upon questions of fact and entitles him to have the evidence submitted to the jury, if, viewed in its aspect most favorable to him, there is any basis for a jury finding, and the rule that the decision of the circuit court is entitled to weight, would coincide and tend in the same direction; but where the question for review in this court is a ruling of the trial court taking the case away from the jury on account of insufficiency of evidence, then the double rule in question is contradictory and inconsistent. Add to this confusion that several justices of this court seem to have a different way of stating the rule, and we have a deplorable situation. See *Zabawa v. Oberbeck Bros. Mfg. Co.* 146 Wis. 621, 131 N. W. 826, dissenting opinion; *Collier v. Salem,* 146 Wis. 106, 130 N. W. 877; *Lines v. Milwaukee,* 147 Wis. 546, 133 N. W. 592; *Collins v. Janesville,* 117 Wis. 415, 423, 425, 94 N. W. 309; *McCune v. Badger,* 126 Wis. 186, 189, 105 N. W. 667; *Fleming v. Northern T. P. Mill,* 135 Wis. 157, 114 N. W. 841. "Considerable reliance," *Lind v. Uniform S. & P. Co.* 140 Wis. 183, 188, 120 N. W. 839; *Fitzpatrick v. Lake Superior T. & T. R. Co.* 142 Wis. 65, 70, 124 N. W. 1054.

But the further "reasonable doubt" addition to this rule applied in the present case goes beyond anything heretofore approved by this court, although there is a suggestion of it in a dissenting opinion by Mr. Justice MARSHALL in *Sparks*

*v. Wis. Cent. R. Co.* 139 Wis. 108, 120 N. W. 858. The confusion that has crept into the courts on this subject is well displayed in the decision in *Kroger v. Cumberland F. P. Co.* 145 Wis. 433, 130 N. W. 513, and perhaps it was well to say, as was said in *Meyst v. Frederickson,* 146 Wis. 85, 130 N. W. 960: "This rule is not an arbitrary one, but applies with varying strength according to circumstances." This is equivalent to saying this rule is not a rule. True, there is no rule without its exceptions, but an exception is not a question of varying strength. The instant case must have been one for the application of the rule with great strength. When the jury and the circuit judge both pass on the amount of the damages suffered in a personal injury case, this rule in favor of the decision of the circuit court seems to lose its force altogether, and this court often undertakes to disagree with the court below, yet there must in nearly all such cases be a reasonable doubt with reference to the amount of damages actually sustained. *Olwell v. Skobis,* 126 Wis. 308, 105 N. W. 777; *Koepp v. Nat. E. & S. Co., ante,* p. 302, 139 N. W. 179.

If this were a rule of property or a question subject to the maxim *stare decisis,* it might be considered rash at this late day to suggest a correction, and in such case we would be obliged to call upon the legislature for relief. But that branch of the government is hardly able to give us relief from the infirmity displayed by the alleged rules. Neither can it be claimed that a decision by the supreme court that confusion is clear will have the desired effect. The situation seems to call for a new application of the "rule of reason" to a much beclouded situation.

I am authorized to say Mr. Justice KERWIN concurs in this dissent.