Wilgrube v. Nast, 178 Wis. 535.

---

WILGRUBE, Respondent, vs. NAST, Appellant.

*October 10—November 8, 1922.*

*Fraud: Misrepresentation as to financial condition of corporation: Evidence: Sufficiency: Presumed knowledge of president: Right of prospective purchaser to rely on statements.*

1. It is not necessary to decide whether an action was at law or in equity, where the court, against the objection of the defendant, dismissed the jury and made findings of fact, if under the evidence a verdict should have been directed for the plaintiff.

2. In an action to recover the purchase price of corporate stock because of fraudulent representations of the defendant, who was president of the corporation, the evidence (set forth in the statement of facts) is *held* to show that the corporation was insolvent, that the defendant knew this fact, and that plaintiff had a right to rely on the representations made.

3. The president of a corporation, making representations to a prospective purchaser of its stock, is bound to know the financial condition of the company, and the purchaser has a right to assume that he had knowledge whereof he spoke.

4. A contracting party has the right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual engagement, and he is under no obligation to investigate and verify statements to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith.

APPEAL from a judgment of the circuit court for Fond du Lac county: CHESTER A. FOWLER, Circuit Judge. *Affirmed.*

Action to recover the purchase price of certain shares of stock. The complaint alleged that the defendant sold and delivered to plaintiff ninety shares of the capital stock of the Romaine Motors Company for the sum of $8,000; that the par value of the stock was $100 per share; that to induce the sale defendant falsely and fraudulently represented that a number of new automobiles in the building then occupied by the company were the absolute property of the company, whereas in fact these automobiles were in possession of the company solely on consignment and that fifteen per cent. of the wholesale price had been paid; that defendant represented that the company had borrowed $15,000 at a local bank solely on its credit, whereas in fact the bank had demanded that the officers of the company personally indorse the note; that the defendant further represented that the inventory value of all the property of the company amounted to $76,000, whereas in fact the total inventory value did not exceed $40,000; and that defendant had represented that the company was making

money, whereas in fact it was on the verge of bankruptcy. There were further charges of misrepresentation as to the amount of machinery located in a certain warehouse; as to the financial condition of a certain branch business of the company; and as to the value of a number of second-hand automobiles in possession of the company.

The complaint further alleged that plaintiff had tendered back the stock and demanded the purchase price and that defendant had refused to return the money. The relief demanded was that:

"The contract of sale so made between the parties be declared null and void and that he have and recover of the defendant the sum of $8,000 so paid by him for said stock to the defendant, and that he have such other and further relief as to the court may seem just and equitable, and further, that he recover his costs and disbursements herein."

Defendant denied all the material allegations of the complaint.

Plaintiff testified that he lived in Sun Prairie; that he saw the shares advertised for sale in a Milwaukee newspaper; that after writing he went to Fond du Lac to see defendant, was met at the station by a Mr. Westberg, and that they then went to the garage and met defendant. Concerning his visit to the garage he testified in part:

"The defendant said that everything in the building belonged to the company and everything that they had was paid for except a few current bills, small bills that had just come in a short time or probably hadn't come in at all, but there was $15,000 borrowed at the bank. I asked him at the time whether they personally had guaranteed payment of the note and whether the company had borrowed it as a corporation, and he said that they hadn't guaranteed payment of the note, that the company had borrowed the money to pay for the cars in stock they had on hand."

"The next morning I asked him again about that note of $15,000 and asked him whether there was $50,000 worth of stock on hand, figuring $35,000 of stock being paid in and $15,000 borrowed, whether there was $50,000 worth of

goods on hand. Mr. Westberg made the statement in *Mr. Nast's* presence that an inventory of stock on hand showed $76,000. *Mr. Nast* said this was correct. I asked the defendant again about the personal guaranty on the note and he said he hadn't made any personal guaranty of payment. . . . *Mr. Nast* did not tell me I could get the facts about the company from the other officers. I did not go to the bank."

It appears that plaintiff then returned to Sun Prairie and came back to Fond du Lac on the 26th of April. On that date he paid for the stock. Concerning his actions thereafter he testified:

"At the directors' meeting I was elected president of the company. I didn't look into the affairs of the company right then. I believed the statements made by *Mr. Nast*. I figured out it would probably be a good proposition to a certain extent, on the statements of *Mr. Nast*. . . . In the meantime I found out that all the new cars on the floor belonged to the General Motors Company, they were placed there on consignment, to be paid for as they were sold. I think there were eight cars, . . . the same cars that *Mr. Nast* showed me and told me belonged to the company."

Defendant testified:

"I introduced the plaintiff to Mr. Romaine and told him that Romaine was secretary and treasurer and he could find out everything about the business through Mr. Romaine. . . . I introduced him to Mr. Seefeldt. He was vice-president of the company. We talked together five or ten minutes. We walked downstairs, myself, the plaintiff, and Mr. Romaine. They stayed and talked together and I went home. . . . I showed him a statement which was sent to the General Motors Acceptance Corporation, it was made a little later than the first of January. . . . That statement showed the assets of the company to be around about $75,000. I did not know of any other statement showing the assets of the company except this one that I showed him. . . . He looked it over and said it was all right."

"I knew there was an indebtedness of $1,000 to Toolheim,

but nothing was said about it because he was supposed to go to Romaine to find that out. . . . I knew there was a bill of $1,528 to the Firestone Tire Company, that was on the report. . . . I didn't know at that time what the indebtedness of the company was. I sent him to Romaine to find out."

There was testimony by the officers of the company that defendant was aware of the poor financial condition of the company; that he had examined the books; that as president and general manager he had taken part in certain transactions resulting in some of the debts owed by the company; that they had been introduced to plaintiff but had not been asked as to the affairs of the company; that they had not seen plaintiff examine any financial statement; that plaintiff had never been left alone with any of the directors; and that defendant at one of the meetings of the directors had said that the stock was not worth twenty-eight cents on the dollar.

Judgment was entered in accordance with the prayer of the complaint.

For the appellant there was a brief by *Reilly & O'Brien* of Fond du Lac, and oral argument by *J. E. O'Brien.*

*B. F. Boreson* and *R. L. Morse,* both of Fond du Lac, for the respondent.

JONES, J. Although the trial was had before a jury, the court ruled that in actions for rescission of sales on the ground of fraud the jurisdiction of law and equity is concurrent; that the prayer that the sale of the stock be adjudged null and void and that plaintiff have judgment for the return of the purchase price paid and for other relief gave notice to the defendant that the suit was conceived in equity and that equitable jurisdiction was invoked.

It was also held that by failing to raise the point that there was an adequate remedy at law by answer or de-

murrer defendant had waived the objection that the case was not cognizable in equity. To this ruling defendant's counsel objected, claiming the right to a trial by jury.

The court dismissed the jury and made findings of fact to the effect that, among other things, defendant had represented that the assets of the company were $76,000 and that the liabilities were $15,000 owed to a bank, $21,500 due on a land contract, and a few small bills; whereas in fact the assets were largely below the amount represented and that there was owing, in addition to the amounts represented, approximately $11,000; that the cars represented to have been owned by the company were merely held by it on consignment; that the $15,000 note at the bank had been made on the personal security of the officers and not on the credit of the company as represented; that the plaintiff made no investigation to ascertain the truth of the representations, but relied on the statements of defendant, and that under all the circumstances other persons so situated as the plaintiff would have relied on such statements without ascertaining as to their truth.

In view of the conclusion we have reached it is not necessary to decide whether the action was legal or equitable, since we hold that even if it was legal in its nature a verdict for the plaintiff should have been directed.

In the printed case much of the testimony is omitted. A careful examination of the case and record has convinced us that if the jury had made answers in favor of defendant on the questions requested by his counsel the court would have been justified in setting them aside on the ground that they were unsupported by credible evidence.

It is true that the defendant denied having made many of the representations relied on by plaintiff. But it is admitted that a statement representing the assets of the company to be about $76,000 was shown by defendant to plaintiff. The undisputed testimony was that at that time the assets were not more than $62,000 and that the lia-

bilities, exclusive of the capital stock, were about $44,000. Although the indebtedness of the company was spoken of in the conversation between the parties, it is. undisputed that defendant did not state the full amount.   This is also true of the statement shown to plaintiff, although it purported to state the indebtedness.   The testimony shows, as found by the court, that nine cars of the value of $12,000 or more which were in the show room were held on consignment merely and that only enough of the purchase price had been paid to secure possession.   The natural inference which the plaintiff drew from this statement was that the company was in a fairly prosperous condition.

Defendant's counsel rely largely on the claim that defendant was wholly ignorant of the financial condition of the company and that he acted in good faith.   It is true he testified that he never went over the financial affairs of the company and did not know of its condition; that he had nothing to do with the books; that he gave plaintiff all the information he had concerning the affairs of the company; that he thought the company was in good condition financially; that he never bought any of the goods.   It was shown, however, by the admission of defendant that there were considerable amounts of indebtedness not on the statement, and, by record evidence, that he had ordered goods for a considerable amount.   He had attended the meetings of the board of directors when the financial affairs were discussed.   There was the testimony of two witnesses, officers of the company, that at a meeting held about March 15th, before the sale, defendant had stated that the stock of the company was not worth more than twenty-eight cents on the dollar.   He denied this statement, but he testified as follows:

"I never said the stock was worth only twenty-eight cents on the dollar.   I did say to my associates that if they didn't work it different the. stock wouldn't be worth twenty-five cents on the dollar."

He admitted that he knew that checks of the company had been dishonored at the bank. The following letter, signed by him, was left with the directors:

"The meeting that was called for Tuesday evening, March 22, was for the purpose of discussing the following: At the request of the Commercial National Bank I must countersign all checks paid out by the Romaine Motors Company, and without my signature it is not valid. This is to insure against any more overdrafts and to protect our future credit as well as retain the good will of the banks at large. As president and manager of the Romaine Motors Company I am held responsible for any mismanagement while at its head. In order to protect my personal and future credit, the bank has mapped out this policy as compulsory in order that we may use the Commercial Bank for banking purposes. The past policy of the company must cease, and be put on a new basis, that of financial independence. This cannot be done unless system, care, and order as well as routine is inaugurated in the ranks. There has been in the past a feeling that if one barely makes a living— that is enough—why bleed the company in that manner? Why not endeavor to make a good living, and then some? If I am given my way in this matter I can put this company on Easy street without future worry to any of the company's stockholders. Realizing the danger of this easy-going policy of 'I don't care,' and the ultimate end to which it will lead us, and the past experience of the existence of this company, the little progress it has made, the little money it has earned, I again request to have full charge of the running and policy of this company, endeavoring with the co-operation of all to make it the biggest and best organization in the city. The conclusion spells a profit, accomplishment, successful organization and financial independence, and the good will of all the banks, supply houses, and the most of all a reliable rating in Dun and Bradstreet.

"E. A. NAST, President."

The record evidence and the admissions of defendant convince us that the testimony of defendant that he was ignorant of the financial condition of the company is not credible. The evidence that the company was insolvent and

that defendant knew it was convincing, and it is significant that in July succeeding the sale a receiver for the company was appointed.   Moreover, if defendant did not know the financial condition of the company, in making material representations to a prospective purchaser he was bound to know.   *First Nat. Bank v. Hackett,* 159 Wis. 113, 119, 149 N. W. 703; *Helberg v. Hosmer,* 143 Wis. 620, 128 N. W. 439; *Kathan v. Comstock,* 140 Wis. 427, 432, 122 N. W. 1044, citing cases:

On the oral argument it was claimed that plaintiff failed to make sufficient examination of the affairs of the company and had no right to rely on the representations alleged to have been made.   Although the defendant claimed that he sent plaintiff to Romaine, the secretary and treasurer, for information concerning the affairs of the company and that plaintiff stayed and talked with Romaine, the overwhelming weight of testimony is that this was untrue.   On the contrary, from the time plaintiff reached Fond du Lac he was constantly in the company of defendant or Westberg, with whom he slept, and who entertained him.   Westberg had advertised the stock for sale in the Milwaukee Journal; had communicated with plaintiff at his home in Sun Prairie and met him at the train, and it is evident that he and the defendant took charge of the plaintiff while the negotiations were going on and so conducted them as to divert the investigation which might otherwise have been made.

Plaintiff had been a director and superintendent in a canning factory at Sun Prairie for five years.   Before that he had been a farmer.   He had attended meetings of the canning company and had received annual statements of the business and knew how such statements were made up.   He had owned automobiles, but had no acquaintance with the kind of business carried on by defendant and his company.

Defendant testified that the books were in such shape that he could not make anything out of them, and it seems

reasonably certain that a study of the books by plaintiff could have helped little in any investigation he might personally have made.

The representations made did not relate to opinions but to matters of fact. They were made by the president and general manager of the company to one having the right to assume that he had knowledge whereof he spoke. To a stranger inspecting the plant there seemed nothing to excite suspicion that the statements made were false. We do not consider that ordinary care or diligence required plaintiff to seem to act discourteously to the head of the concern and proceed to cross-examine subordinates, or to procure an audit of the books of the company. It has long been the rule both in England and in this country that a contracting party has the right to rely on the express statement of an existing fact, the truth of which is known to the opposite party and unknown to him, as the basis of a mutual engagement. And he is under no obligation to investigate and verify statements to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith. *Rogers v. Rosenfeld,* 158 Wis. 285, 149 N. W. 33; *Kathan v. Comstock,* 140 Wis. 427, 433, 122 N. W. 1044; *Miller v. Hackbarth,* 126 Wis. 50, 105 N. W. 311; *Kaiser v. Nummerdor,* 120 Wis. 234, 97 N. W. 932; *Birdsey v. Butterfield,* 34 Wis. 52; *Mead v. Bunn,* 32 N. Y. 275, 280; *Rawlins v. Wickham,* 28 L. J. Ch. N. S. 188.

On this branch of the case we not only agree with the findings of the court but are satisfied that there is no credible evidence to the contrary. On consideration of the entire evidence it was sufficient to warrant the findings made by the court in favor of the plaintiff, and, no credible evidence appreciably tending to overthrow the case made by him having been adduced by defendant, it was proper for the court to direct a verdict for plaintiff. The reasons for sustaining the decision of the trial court in granting a

nonsuit or a directed verdict are well stated in *Slam v. Lake Superior T. & T. R. Co.* 152 Wis. 426, 434, 140 N. W. 30; *Riger v. C. & N. W. R. Co.* 156 Wis. 86, 144 N. W. 204; *Sloan v. C., M. & St. P. R. Co.* 151 Wis. 645, 139 N. W. 529; *Meyst v. Frederickson,* 146 Wis. 85, 130 N. W. 960; *Powell v. Ashland I. & S. Co.* 98 Wis. 35, 73 N. W. 573, and in many others which might be cited.

*By the Court.*—Judgment affirmed.

ESCHWEILER, J., dissents.