STADLER and wife, Respondents, v. ROHM, Appellant.
[Case No. 2.]
ROHM, Appellant, v. STADLER and wife, Respondents.
[Case No. 3.]

*Nos. 2, 3. Argued October 1, 1968.—Decided October 29, 1968.*
(Also reported in 161 N. W. 2d 906.)

For the appellant there were briefs by *Bosshard & Sundet* and *Arneson, Berg & Doyle* and *Patrick R. Doyle,* all of La Crosse, and oral argument by *John Bosshard* and *Patrick R. Doyle.*

For the respondents there was a brief by *Johns, Pappas, Flaherty & Harman* and *Donald J. Harman,* all of La Crosse, and oral argument by *Donald J. Harman.*

WILKIE, J. One issue is dispositive of this appeal: Did respondents, by their actions, affirm the contract be-

tween the parties, thus precluding their right to the equitable remedy of rescission? The appellant concedes that the evidence supports the trial court's findings that three misrepresentations were made as inducements to the plaintiffs-respondents' entering into the contract for the purchase of the Guest House Motel. He concedes the materiality of the misrepresentation that there were 40 rooms, whereas in truth there were only 39, and the further misrepresentation involving the understatement of wages for the years 1962 and 1963. The appellant acknowledges the further misrepresentation that the 1964 operating statement would be as good or better than the 1963 statement when, in fact, it was not. However, appellant disputes the materiality of that misrepresentation since the net income for 1964 was, in truth, only $2,100 less than the 1963 income of $58,912.70.[1]

It is well settled that in an action seeking redress for fraud as to any false representation inducing one to enter into a contract:

"The representation must be in regard to a *material* fact, must be false, and must be acted upon by the other party in ignorance of its falsity and with a reasonable belief that it was true. It must be the very ground on which the transaction took place, although it is not necessary that it should have been the sole cause, if it were proximate, immediate, and material." (Emphasis added.)[2]

We think that a $2,100 decline in income is rather an insignificant amount when considering a net income of nearly $60,000, and also considering the fact that the

| | 1964 | 1963 | 1962 |
|---|---|---|---|
| [1] Gross income without sales tax | $87,749.13 | $88,402.57 | $88,182.38 |
| Total expense | 31,012.98 | 29,489.87 | 29,474.87 |
| Net profit | $56,736.15 | $58,912.70 | $58,707.51 |

[2] *Farrar v. Churchill* (1890), 135 U. S. 609, 615, 10 Sup. Ct. 771, 34 L. Ed. 246, cited with approval in *Darlington v. J. L. Gates Land Co.* (1913), 151 Wis. 461, 465, 138 N. W. 72, 139 N. W. 447.

motel was priced at $365,000. We conclude that the trial court's finding of materiality as to this particular representation is against the great weight and clear preponderance of the evidence.[3]

Rohm contends that the Stadlers were aware of the other two misrepresentations found by the trial court, i.e., the missing room and the understatement of wages for 1962 and 1963, prior to August 17, 1965, and thus affirmed the contract when they commenced their legal action on that date.

This court has restricted the application of the doctrine of election of remedies in cases where an action in equity precedes an action at law.[4] However, where an action at law precedes an action in equity the principle that commencement of the first suit may affirm the contract and preclude the equitable remedy has not been affected. In *Schlotthauer v. Krenzelok* [5] this court quoted from the opinion of Mr. Justice ROSENBERRY in *Bischoff v. Hustisford State Bank*: [6]

> " 'A suit in the first instance upon the contract for damages for breach would no doubt be an affirmance of it, which would preclude an action for rescission, but the reverse is not true.' (Emphasis supplied.)" [7]

Further in *Schlotthauer* the court stated that:

> ". . . The reason why a suit at law to recover damages for fraud bars a subsequent suit for rescission is not because there has been an election of inconsistent reme-

---

[3] *Kiefer v. Fred Howe Motors, Inc.* (1968), 39 Wis. 2d 20, 158 N. W. 2d 288; *Jessup v. La Pin* (1967), 35 Wis. 2d 186, 150 N. W. 2d 342.

[4] *Schlotthauer v. Krenzelok* (1956), 274 Wis. 1, 79 N. W. 2d 76; *Bank of Commerce v. Paine, Webber, Jackson & Curtis* (1968), 39 Wis. 2d 30, 158 N. W. 2d 350.

[5] *Supra*, footnote 4, at page 4.

[6] (1928), 195 Wis. 312, 320, 218 N. W. 353.

[7] *See also Beers v. Atlas Assurance Co.* (1939), 231 Wis. 361, 285 N. W. 794. (Action for rescission does not preclude action on contract.)

dies, but rather that the act of instituting an action at law for damages recognizes the existence of the contract and affirms it. Once having been so affirmed, the right to rescind is forever lost. Such act is no different than any other act indicating an affirmance of the contract, such as proceeding with the performance of the contract after discovery of the fraud, or disposing of some of the property acquired under the contract, thus putting it beyond the power of the defrauded party to rescind and place the parties in *status quo*." [8]

Respondents contend, however, that the aforementioned theory does not apply in this case because at the initiation of the suit of August 17, 1965, all of the material facts giving rise to the rescission action were not fully known.

American Jurisprudence states:

"The duty to elect implies as a prerequisite knowledge or its equivalent on the part of the suitor of the facts material to his rights. The selection by him of one of two or more coexisting inconsistent remedies is not irrevocable, as a general rule, unless made with knowledge or means of knowledge of the facts affecting his rights. Thus, although it has been held that ignorance of facts will not relieve a party from the consequences of his election, where such relief would injure an innocent party, ordinarily, if a litigant commences a suit, action, or proceeding in ignorance of substantial facts which offer an alternate remedy, he may, when informed, adopt a different remedy." [9]

Also in *Bank of Lodi v. Washburn Electric Light & Power Co.*,[10] this court stated that "A party is never

---

[8] *Schlotthauer v. Krenzelok, supra*, footnote 4, at page 5. *See also Davis v. Schmidt* (1906), 126 Wis. 461, 106 N. W. 119. (Election to recover damages affirms contract and precludes equitable remedy of rescission.) *Rosenberg v. McKinney* (1909), 138 Wis. 381, 120 N. W. 230. (Election to receive benefits after full knowledge of fraud precludes equitable relief.)

[9] 25 Am. Jur. 2d, *Election of Remedies*, p. 663, sec. 21.

[10] (1898), 98 Wis. 547, 74 N. W. 363. *See also Zwietusch v. Luehring* (1914), 156 Wis. 96, 144 N. W. 257; *Gall v. Gall* (1905), 126 Wis. 390, 105 N. W. 953.

bound by the election of a remedy, made in ignorance of substantial facts, which, if known, might proffer an alternative suit." [11]

In considering whether or not the party choosing to affirm the contract is ignorant of substantial facts at the time he makes his choice it is important to consider whether "such ignorance is the result of a failure to resort to reasonable means of knowledge within his reach." [12]

In *Sciano v. Hengle* [13] this court, quoting from an earlier Wisconsin case, [14] stated that:

"'. . . It is an unsavory defense for a man who by false statements induces another to act to assert that if the latter had disbelieved him he would not have been injured. . . . Nevertheless courts will refuse to act for the relief of one claiming to have been misled by another's statements who blindly acts in disregard of knowledge of their falsity or with such opportunity that by the exercise of ordinary observation, not necessarily by search, he would have known. He may not close his eyes to what is obviously discoverable by him. . . . It is in this sense only that opportunity to know the truth will prevent recovery for deceit. Whether the situation presents or fails to present such opportunity is usually a question of fact. The intelligence or acuteness of plaintiff is one important element. . . . Another, is the reliance reposed by the buyer on the seller by reason of acquaintance or confidence. These and many other considerations have proper effect in deciding whether the

[11] *Bank of Lodi v. Washburn Electric Light & Power Co., supra,* footnote 10, at page 550. *See also Davis v. Schmidt, supra,* footnote 8; *Clausen v. Head* (1901), 110 Wis. 405, 85 N. W. 1028; *Rosenberg v. McKinney, supra,* footnote 8.

[12] *Thoen v. Harnstrom* (1898), 98 Wis. 231, 233, 73 N. W. 1011; *Kaestner v. Kuechle* (1927), 194 Wis. 72, 216 N. W. 141. *See also* 1 Callaghan's, Bryant, *Wisconsin Pleading and Practice* (3d ed.), pp. 304, 305, sec. 7.20.

[13] (1957), 1 Wis. 2d 273, 280, 83 N. W. 2d 689.

[14] *Jacobsen v. Whitely* (1909), 138 Wis. 434, 436, 120 N. W. 285.

truth was obvious, as appears in the various cases already cited and very many others.' " [15]

Bearing in mind these principles it is necessary to look closely at the facts to determine the extent to which respondents actually had, or reasonably could have had, sufficient knowledge to make a binding choice between affirming the contract and rescission thereof.

As to the missing room, there is no question but that respondents knew within a few weeks after taking over the motel, and months before their August, 1965, lawsuit, that there were only 39 rooms. However, Stadler claims to have been informed by a maid that a room in the basement had been used as the 40th room and was not concerned about the matter until a representative of the health department informed him in June of 1965 that the basement room could not be used. After Rohm received Stadler's letter of June 1, 1965, complaining about defective equipment, etc., Rohm went to La Crosse to talk with the Stadlers. Thereupon, a conversation took place concerning the operation of motel equipment and the "missing room." It appears that the main topic of conversation concerned the sale of the next door property which was desired by the respondents for parking facilities. [16] Stadler testified that he offered to forget about his various complaints if Rohm would sell him the property for $20,000. Stadler claims that Rohm wanted $23,000 for it. The offers were refused. Thus it appears quite clear that the Stadlers were really after the extra lot and were willing to forget about the missing room if they could just purchase that lot for their stated price.

[15] *See also Peters v. Kell* (1960), 12 Wis. 2d 32, 106 N. W. 2d 407; *Benz v. Zobel* (1949), 255 Wis. 542, 39 N. W. 2d 713; *Wilgrube v. Nast* (1922), 178 Wis. 535, 190 N. W. 451; *Kaiser v. Nummerdor* (1904), 120 Wis. 234, 97 N. W. 932.

[16] The offer to purchase had contained a provision whereby the Stadlers could purchase this land, but it was crossed out by Rohm before it was signed by him. The Stadlers accepted the offer to purchase as modified.

A short time after the respondents were turned down on their deal to acquire the extra lot, Stadler wrote Rohm the letter of July 30, 1965, concerning the missing room. Thereafter, in early August, Rohm had the next door property fenced in to prevent its use by the Stadlers. Thereupon, on August 17, 1965, the Stadlers commenced suit in county court. The complaint specifically sought specific performance of the parking-lot-purchase contract and an injunction against Rohm to permit the Stadlers to use the property. The complaint, seeking damages, also alleged that:

". . . numerous defects have come to the attention of the plaintiffs all of which were not present at the time and prior to the date of the sale, substantially reducing the value of the motel and causing the plaintiffs irreparable damage; . . ."

The complaint did not specifically mention the "missing room."

From Stadler's testimony it also appears that he had acquired sufficient knowledge prior to August 17, 1965, to be seriously suspicious that the wages reported in the operating statement were understated. He was aware in June that if he continued to pay out wages at the same rate they would exceed those reported in the operating statements of 1962 and 1963.

In June he also became aware that a Mrs. Noha had worked for appellant, and in August he determined that she had been paid wages. He personally contacted her at that time. It was at this time that Rohm blocked off the parking lot. Thereafter respondents sought legal counsel and commenced the August 17, 1965, suit.

It is true that subsequent to these events, Stadler received a letter from the state unemployment department, dated September 30, 1965. Stadler testified that the department indicated that there was about $7,000 paid out in wages that was not reflected in the operating statements attached to the offer to purchase. In November of

1966 Rohm related the understatement at the adverse examination.

On this record it is plain that Stadler had much suspicion concerning "understated wages" prior to the August suit for damages, although he made no attempt to confirm the exact amount of that understatement until after the August suit was commenced.

Under the circumstances, we conclude that Stadler, a man with substantial business experience as an employer (with twenty-five years' experience in the weaving business and more recent experience as a motel and supper club operator), on the threshold of entering into such a business venture, in the exercise of reasonable business prudence, could have acquired more information about the precise amount of the understatement of wages before he chose to affirm the contract by commencing his August suit. According to Stadler's own testimony he relied completely on the operating statements for an indication of the motel's financial position. As appellant points out the latest of these statements (1963) was already a year old at the time Stadler examined it. It should be noted that Stadler does not claim that appellant lied to him about the number of employees. According to Stadler, there was just no discussion of the matter —with the exception of a request for income tax returns, which was denied. According to Stadler no questions were asked about the number of employees, no request was made for the current payroll records, and apparently no request was made to look at the corporate books. As Rohm points out it is hard to believe that a business man of twenty-five years' experience could purchase a $365,000 business with so little investigation.

We think it clear that the respondents comprehended the misrepresentations about the missing room and understatement of wages for 1962 and 1963, and in August, 1965, deliberately chose to affirm the contract and to even compel the appellant to sell them the additional lot.

Only when this tactic did not bring the desired result by which the appellant would agree to sell the additional lot, did the Stadlers change their approach and, five months later, seek rescission. This they cannot do. Findings of the trial court to the contrary are against the great weight and clear preponderance of the evidence; conclusions of law based thereon are in error.

Although we must reverse the judgment allowing rescission and disallowing foreclosure of the land contract, we remand the cause for further proceedings pursuant to respondents' original theory of breach of contract and defendant-appellant's countersuit for foreclosure of the land contract.

*By the Court.*—Judgment reversed and cause remanded for proceedings not inconsistent with this opinion. Costs on this appeal to appellant.