AGEN, Administrator, Respondent, vs. THE METROPOLITAN LIFE INSURANCE COMPANY, Appellant.

*October 21, 1899 — January 9, 1900.*

*Life insurance: Death, natural causes or suicide? Presumptions: Evidence: Province of court and jury: Review on appeal.*

1. In case of a death under such circumstances that it may or may not have been caused by suicide, the legal presumption is in favor of the latter, which should prevail in the absence of evidence sufficient to establish the former to a reasonable certainty.
2. It is the exclusive province of the court to determine whether evidence is susceptible of a reasonable inference that death was caused by some other means than that of suicide, and, that being determined in the affirmative, it is the exclusive province of the jury to determine where the truth lies.

Agen vs. The Metropolitan Life Ins. Co.

3. The decision of the trial court that the evidence produced on a trial is susceptible of a reasonable inference warranting the verdict of the jury should not be disturbed unless, from an examination of the record, it clearly appears that such decision was erroneous.

4. In the circumstances stated in the foregoing, whether the jury properly drew the inference which resulted in their verdict, so long as such inference was within the limits of reasonable probabilities, looking only to the evidence produced, is not a subject of inquiry on appeal; and in determining whether the trial court erred in deciding that the fact was reasonably inferable from such evidence, doubts are to be resolved in favor of such decision.

5. Where the reasonable probabilities from the evidence all point to suicide as the cause of death, so as to establish it, in the light of reason and common sense, with such certainty as to leave no room for reasonable controversy on the subject, a jury should not be permitted to find to the contrary and have such finding stand as a verity in the case, but the question should be decided by the trial court as one of law.

[Syllabus by MARSHALL, J.]

6. WINSLOW and DODGE, JJ., dissenting, are of the opinion that the circumstances shown by the evidence are fully as consistent with the theory of accidental shooting as with the theory of suicide.

APPEAL from a judgment of the superior court of Douglas county: CHARLES SMITH, Judge. *Reversed.*

Action on a life insurance policy. The right to recover turned on whether the assured committed suicide. At the close of the evidence counsel for defendant moved the court for the direction of a verdict, which was denied. There was a general verdict for the plaintiff, and a motion made and denied to set the same aside because not warranted by the evidence and for other reasons. The appeal is from the judgment rendered on the verdict in plaintiff's favor.

*J. A. Murphy*, for the appellant.

For the respondent there were briefs by *Crownhart & Foley*, and oral argument by *C. H. Crownhart*.

The following opinion was filed November 7, 1899:

MARSHALL, J. As we view the record on this appeal, a decision of the question of whether the evidence warrants

the verdict is all that is required. Such evidence is nearly all circumstantial. The undisputed facts are substantially as follows:

The deceased, Clarence S. Griffin, at the time of his death, resided with his family, consisting of his wife and step-daughter four and one-half years of age, in the second story of a dwelling house in the city of Superior, Wisconsin, which was occupied on the first floor, partly by William Butler and family and partly by Louis Burgraff and family. The Griffin kitchen was in the front part of the house at the right of the front entrance. From it there was an out-side door leading to a back stairway, the foot of which reached to about the location of the door of the Butler kitchen. There was also a door between the Griffin kitchen and their dining room back of such kitchen; also a door connecting such dining room with a bed room used by the family for sleeping apartments, such room being at the left of the dining room as the latter was approached from the kitchen. There was a commode near the bed-room door inside such room at the right of the entrance, in the drawer of which the deceased customarily kept a revolver when it was not on his person. He always placed it there evenings after his return from his day's labor, if he had carried it during the day.

About 9:15 on the evening of December 14, 1894, the Griffin family all being at home, and the women occupants of the lower part of the house having retired for the night, footsteps were heard in the upper kitchen as of some person moving hurriedly across the floor. Immediately thereafter Mrs. Griffin left such kitchen by the back stairway, taking with her, or followed by, the little girl, and closed the door behind her. She ran quickly down such stairway, and in a nervous and excited manner rapped sharply at Mrs. Butler's kitchen door. About the time the circumstances just related were occurring, a person passed from the Griffin dining room

into the bed room and there disturbed some furniture, creat-
ing a noise distinctly heard by those occupying the apart-
ments below, then passed rapidly back from the bed room
through the dining room into the kitchen and to the back
door thereof, which he noisily opened and swung back,
apparently, so as to forcibly strike the wall, then crossed
the room from the location of such door to a point near the
door leading to the front hall, making a noise in his course
something like that caused by turning over a chair, which
was immediately followed by the report of a pistol in the
room, then by a sound as if of a body falling on the floor, and
then by human groans and a noise as of the beating of feet
on the floor. The report of the pistol and the signal given
by Mrs. Griffin of her presence at Mrs. Butler's door occurred
at about the same instant. Mrs. Butler responded to such
signal by opening her door. Mrs. Griffin, apparently much
excited and frightened, inquired for milk for her little girl,
then passed into Mrs. Butler's apartments, exclaiming almost
immediately that she was afraid her husband had shot him-
self. She then cried and appeared to be in great mental
distress. She made no further mention of desiring milk for
the child, but clasped her hands, continued to cry, and again
exclaimed, "He shot the revolver and I am afraid he has
shot himself." She did not go to her husband then or after-
wards till some time the next day and after he had been re-
moved to the hospital. No one was in the Griffin apart-
ments but the deceased from the time Mrs. Griffin left them
as related till about five minutes after the shot was heard,
when several persons went there and discovered the follow-
ing conditions of things: The back entrance door to the
kitchen was partly open, the dishes were on the table about
as they were left at the last meal, a light was in the kitchen,
and a chair was partly turned over on the floor. The com-
mode drawers, or one of them, was pulled entirely or partly
out. On the side of the room nearly opposite such back door,

Griffin lay as if he had fallen backward against the wall, then slid down, leaving his head and shoulders against the wall, and his limbs nearly straight out on the floor towards the center of the room, with his hat on the floor between them. There was a bullet wound in the right side of his head a little above and about midway of a line drawn from the eye to the center of the ear. An upturned chair was a short distance away from him. His hands were by his side and he was moving them and his feet convulsively. His revolver was by him on the floor, partly under his legs and a little towards the left side, and near it was a revolver case in which it was customarily kept. There were no powder marks on the head. The revolver showed that it had been recently discharged. The man died the next day without having regained consciousness.

A *post mortem* examination was made which revealed the following facts: The bullet passed into the head nearly at right angles with the side. It ranged slightly upward and lodged against the opposite table of the skull and was somewhat flattened. The inner table of the skull where the bullet entered was considerably fractured, pieces of it having been driven into the brain substance, which, on that side of the head, was much lacerated, disorganized, and congested with blood. There was no evidence observed of powder, fire, or smoke having been projected into the brain, nor any external indication of fire, smoke, or powder. The evidence tended to show that the revolver, when discharged, must have been held at least eight inches from the head to account for the absence of discoloration on the surface in the vicinity of the wound, or that it was held firmly against the head. The latter situation at the time the pistol was discharged, while it would account for absence of external evidence, would suggest the presence of internal evidence of fire, powder, and smoke having been forced into the brain; but, as before stated, no such evidence was discovered. The

man did not die till about twenty hours after he received the wound, and the autopsy was not made till some time after death.   The brain substance was very badly lacerated, disorganized, and discolored by blood, so as to account, in a measure, for the absence of discoloration by smoke, powder, or fire, and of any other evidence of the presence of any foreign substance in the brain, except the bullet and pieces of bone carried in by it, other than the general disorganized condition of the brain substance on the side of the head where such ball entered.

There was evidence of experts to the effect that if a pistol be discharged with the muzzle pressed firmly against the head, there may be no evidence of fire, powder, or smoke, externally or internally.   There was also expert evidence to the contrary, some of it by persons who had never seen such a case.   There was evidence of a person to the effect that he had seen just such an occurrence, and that there was no external evidence of fire, powder, or smoke.   There was also evidence of actual tests made with the revolver which caused the death of Griffin, showing that a shot from it would burn cotton batting but slightly if at all more than three or four inches away, but would produce powder marks on tissue paper twelve or fourteen inches away   There was no evidence to create even a suspicion that any human agency was concerned in firing the shot which killed Griffin, other than that of himself.

Now looking at the circumstances and evidence related, leaving out of view all evidence tending to show motive for self-destruction, because there was ample room to find both ways on that subject, can an appeal to common sense and common experience, as to where the truth lies, result in any other response than that Griffin committed suicide?   That is the question.   If it may reasonably be answered in the negative, the judgment appealed from cannot be disturbed.

It is said that the legal presumption is that the circum-

stance which caused Griffin's death was the result of acci-
dent or some outside human agency, and that is true.  But
it is a rebuttable presumption and easily yields to physical
facts clearly inconsistent with it.  The highest crime known
to the law may be established, overcoming the legal pre-
sumption of innocence, by circumstantial evidence alone;
and so may an essential fact, and more easily, within the
rules of law and of reason, in a civil case.  What circum-
stances were there here to support the presumption of acci-
dent or outside agency ?  None resting in reason, must be
the answer.  We say that confidently.  Different minds can-
not reasonably come to different conclusions from the evi-
dence on that subject.  The fact, established with as much
certainty as one can be by circumstantial evidence, that
there was no one in the room with Griffin when the shot
was fired, and that it did not come from outside the build-
ing, overcomes the presumption of human agency other than
that of Griffin, so as to leave no reasonable hypothesis upon
which it can stand.  The further fact, established with the
same certainty, that the pistol was held at right angles with
the head when discharged, and that the deceased was stand-
ing upright, as indicated by the manner in which he lay
when found, destroys utterly the presumption of accident
because of the impossibility, say nothing of improbability,
of the firearm getting, by any other means than that of de-
sign, into the requisite position to cause the wound as it was
caused.  So all presumptions in plaintiff's favor are rebutted
by the physical situation.  True, Mrs. Griffin testified that
all was calm in the household when she left the room; that
she and her husband had passed a pleasant evening playing
cards; that when she left the room there was nothing un-
usual in her husband's conduct, and that he did not have his
hat on; but that is so overcome by the undisputed facts and
facts established beyond controversy,— notably, that when
Griffin was discovered after the shooting his hat was on the

floor between his outstretched legs, that unusual noises were heard in the Griffin apartments, indicating excitement on the part of the occupants from just before Mrs. Griffin left the room till the shot was fired, that she left her kitchen in a state of excitement and fright, which increased when the shot was fired, the situation and her condition causing her to exclaim, "He shot the revolver, I am afraid he has shot himself," or words to that effect, and her subsequent conduct — as to produce conviction to a moral certainty that her description on the trial of the condition of things in her kitchen when she left it is not true. The fact in that regard was established so conclusively as to leave no ground for a reasonable inference to the contrary. All the reasonable probabilities are one way.

What have we left but a multitude of circumstances, all pointing to and consistent with the theory of suicide and inconsistent with any other reasonable theory? Nothing that can be found in the record, in our judgment. If it could be said that the evidence does not point that way so strongly but that there is yet room for a reasonable inference inconsistent with it, the case was for the jury, and since the trial court, who saw the witnesses and heard all the testimony, decided that there was such room, this court should lean towards supporting that decision in a case of fair doubt on the question. *Powell v. Ashland I. & S. Co.* 98 Wis. 35; *Hennessy v. Douglas Co.* 99 Wis. 129; *Dewey v. C., M. & St. P. R. Co.* 99 Wis. 455. Neither of such circumstances exists here. The jury could not have said, as men, that the circumstances did not show suicide so as to leave no reasonable probability to the contrary; therefore it was not permissible for them to say it as jurors and have that stand as a verity in the case. The court should have granted the motion to direct the verdict, and, failing in that, should have set the verdict aside and granted a new trial.

We are not unmindful of the fact that there are numerous adjudications in cases of this kind where there is reason to say that courts have allowed a finding to be made by a jury and to stand on mere conjecture in regard to death having been produced by some other circumstance than that of suicide, seemingly overlooking the salutary rule that there is a limit beyond which a jury cannot go,— the line of reasonable probability,— and that such rule is as inflexible as any in our jurisprudence. *Hyer v. Janesville,* 101 Wis. 371. Several of the cases referred to are cited to our attention to support the judgment appealed from. The same class of cases were confidently relied on by plaintiff in *Rens v. N. W. Mut. R. Asso.* 100 Wis. 266, but the court declined to follow them. The particular circumstance there relied upon to carry the case to the jury was absence of powder smoke or fire marks upon the head. This court, by Mr. Justice Winslow, said 'there is but one reasonable inference that can be drawn from the evidence; that to attempt to draw any other would amount to a pitiable stultification of the reasoning powers.' True there was no autopsy in the *Rens Case,* but that is not regarded as materially discriminating the case from this, since the death of Griffin did not occur for a considerable length of time after the wound was received, and the *post mortem* examination was delayed for some time after that and took place when the condition of the brain was such as to render a careful examination of it, for evidences of powder and smoke, not very certain to result in discovering the exact truth. Then again, it is in evidence that such an examination is by no means infallible, and the adjudications are to the same effect.

A careful examination of the cases to which we are referred, and which are relied upon to support the judgment, shows uniformly some circumstance or circumstances reasonably inconsistent with suicide which are not found in this case. In *Stephenson v. Bankers' L. Asso.* (Iowa), 79 N.

W. Rep. 459, which is probably as strong a case as can be referred to, it was said that the direction of the bullet and position of the body were, or might reasonably be considered, inconsistent with the theory that the deceased fired the shot. In *Walcott v. Metropolitan L. Ins. Co.* 64 Vt. 221, absence of powder marks under the peculiar circumstances of the case was deemed sufficient to carry the case to the jury, relying on 3 Whart. & S. Med. Jur. (4th ed.), § 287, as to the probable appearance of gunshot wounds where a shot has been fired with the muzzle of the gun in close proximity with the body. Experience shows and adjudged cases as well, as before indicated, that the Wharton theory is not very reliable in case of a shot being fired by a modern revolver. In *Beckett v. N. W. M. A. Asso.* 67 Minn. 298, the body of the deceased was found in an out of the way place where he might easily have been murdered by some person and then his body so arranged as to indicate self-destruction. We could go on through all the cases cited and show that while the courts, in some of them at least, appear to have permitted conjecture to prevail over reason, in no case do the facts point to suicide so as to exclude every other reasonable hypothesis as clearly as in the one before us.

We have discussed the question for decision at much greater length than was necessary in order to reach a satisfactory conclusion and state clearly the reasons therefor, but the subject is of sufficient importance to render all that has been said quite proper. It is considered that the evidence shows that Griffin intentionally destroyed his life, that such fact appears with such clearness as to leave no room for any other reasonable hypothesis, that the motion for the direction of a verdict should have been granted, and failing in that, the court should have set aside the verdict and granted a new trial. In reaching this conclusion full effect has been given to all legal presumptions in plaintiff's favor, and the rule that the burden of proof was on the defendant

to satisfy the jury, by a preponderance of the evidence, that Griffin died by suicide. The judgment must be reversed and the cause remanded for a new trial.

*By the Court.*— So ordered.

WINSLOW, J. I respectfully dissent in this case, because I think the circumstances shown by the evidence are fully as consistent with the theory of accidental shooting as with the theory of suicide, and, if such be the case, the law is well settled that the legal presumption is against suicide, and must prevail. With all deference to the opinion of the court, I must be allowed to say that there are important facts in the case which are not stated in that opinion. Some of these facts I will briefly state. In the first place, there was substantially no evidence of a previous suicidal intent. The deceased had never made a threat of suicide, so far as the evidence shows, nor does it appear that there was any substantial cause for unhappiness or despondency on his part. It is true that one witness testified that at some time in 1894, before the marriage of the deceased, he asked the witness if she thought life was worth living, and that he then appeared despondent; while another witness says that he seemed despondent in December just before the shooting, but the remoteness of the first-named incident, in point of time, as well as the utter absence of any other testimony indicating any thought of suicide, deprive it of any substantial weight, especially in view of the fact that there is considerable evidence given by his familiar friends to the effect that he had no financial troubles, and that he was always good natured and happy, even up to the very day of the shooting. Certainly it cannot be said that suicidal intent or any reasonable cause for suicide appeared in the evidence. While not by any means controlling, absence of motive or previous suicidal intent is always an important consideration.

Agen vs. The Metropolitan Life Ins. Co.

Again, the condition of the pistol with which the shot was fired is not adverted to in the opinion of the court. The pistol was brought into court, and was sent up with the record. It was a cheap self-cocking revolver called the American bull dog. By reason of some defect in its mechanism, the cylinder would easily turn in either direction while the hammer was down, so that the hammer would rest upon a loaded cartridge. When so turned, it seems unquestionable that, if the hammer was struck, the pistol would be discharged. The hammer was a projecting one, and, if the pistol fell, the chances of the hammer striking and exploding the cartridge upon which it might be resting seem to me very great. Now, it appears by the testimony of Mrs. Burgraff, who lived below, that just before the shot she heard "a quick racket, as if some one had run against something like a chair," and the witnesses who first came into the room after the shot all testify that there was a chair close to the deceased, partly overturned. These two pieces of testimony seem to fairly demonstrate that some accident happened with the chair before the shot. Did the deceased stumble over it or against it? We do not know. But certainly the theory that he did so would have strong evidence in its support. Now, if he did so while taking the revolver from his pocket to put in the commode before going to bed (as the evidence showed his custom was), does it not appear entirely possible and probable that it might have fallen and struck the hammer upon some part of the chair, and so discharged it?

Another fact comes in here. The evidence shows, without substantial contradiction, that the revolver was not held close to the head, but at least a foot from it. This is in part shown by the evidence of the physicians who performed an autopsy and removed the brain. They agree that there were no marks of powder or discoloration from burning in the brain, and they also agree that, if the pistol was pressed

close against the skull, there must be such marks. The expert witness called by the defendant does not dispute this proposition. The fact is undisputed that there were no powder marks or burns on the face. The remaining cartridges were afterwards fired from the pistol, and it was found that, at a distance of a foot or fourteen inches, tissue paper and cotton batting would be powder burned. The conclusion is inevitable that the pistol, when it exploded, was more than one foot from the face. Now, it is believed that, in case of deliberate suicide, the unhappy actor is far more likely to press the pistol against a vital part, in order to make sure work, than to hold it awkwardly at a distance. But in this case the pistol was undoubtedly at a distance; and can it be said that it is more likely that it was held by the deceased at a distance, and deliberately fired, than that the deceased, by some mischance, fell over the chair, dropped the revolver, and that the hammer struck, and exploded it accidentally? The fact that the bullet entered the head at right angles throws little light upon the question. It is a circumstance, of course, to be considered by the jury, but not controlling. It is not demonstrated by the evidence that the man was standing when the ball was fired. He may have been partly down, or falling, and no one is wise enough to be able to say that his head could not have been in the proper position to receive the shot in the way in which it was received, if it were accidentally fired. Again all the testimony of Mrs. Griffin as to what took place in their rooms that evening before the shot was fired, which tends to rebut the theory of suicide, is rejected as false. I shall not go over it in detail, but simply say that, to my mind, it is entirely credible, and is not so completely overcome by the other evidence, or the inferences to be drawn from such other evidence, that the court can say that it must be rejected as incredible.

I have thus briefly referred to the principal additional facts which seem to me to make this case a proper case for the jury, within a line of cases numerous and well established, some of which I cite. *Home B. Asso. v. Sargent*, 142 U. S. 691; *Stephenson v. Bankers' L. Asso.* (Iowa), 79 N. W. Rep. 460; *Travelers' Ins. Co. v. Nitterhouse*, 11 Ind. App. 155. Under the reasoning of these authorities, some of which are more extreme in their facts than the present case, I cannot agree that the unquestioned presumption of accidental death was so negatived by the evidence in this case as to justify the court in taking the case from the jury. I have nothing to take back from what was said in the *Rens Case*, 100 Wis. 266. There is, in my judgment, no substantial similarity between the two cases, except that the death was the result of a pistol wound in each case. Not only was the suicidal intent proved to a demonstration in that case, but the deceased made an unsuccessful attempt to cut his throat the night preceding his death. He purchased the revolver and ammunition on the day of his death; and took them to his rooms, with the avowed purpose of suicide, and resisted attempts to take the weapon away, then went into a room alone, and shortly afterward the fatal shot was heard. The conclusion that the case was one of suicide was inevitable.

It is said in the opinion of the court in the present case that, if there is room for a reasonable inference under the evidence inconsistent with the theory of suicide, the case was one for the jury. This is but another way of expressing the principle that, if reasonable minds viewing the evidence may differ in their conclusions therefrom, the question should be submitted to the jury. Two members of this court, as well as the trial judge and the jury, who saw and heard the witnesses, have reached a different conclusion as to the inferences fairly deducible from the evidence from that reached by a majority of this court. Is it not an extreme statement

to say, as is said in the opinion, that "different minds can-not reasonably come to different conclusions from the evi-dence?"

DODGE, J. I concur in the views expressed by Mr. Justice WINSLOW.

A motion for a rehearing was denied January 9, 1900.