SWANSON, Respondent, vs. LAKE SUPERIOR TERMINAL & TRANSFER RAILWAY COMPANY, Appellant.

*November 6, 1929—February 4, 1930.*

494

For the appellant there was a brief by *Murphy, Hughes & Anderson* of Superior, and oral argument by *C. J. Hughes*.

For the respondent there was a brief by *Humphrey Barton* of St. Paul, Minnesota, and *Powell & Sprowls* of Superior, and oral argument by *Mr. John W. Sprowls* and *Mr. Barton*.

The following opinion was filed December 3, 1929:

ROSENBERRY, C. J.   In the view which we take of this case it is not necessary for us to consider all of the questions raised by counsel.   If it appears as a matter of law that the failure of plaintiff to exercise ordinary care in accordance with the finding of the jury was more than a slight want of ordinary care, the judgment cannot stand and other questions become immaterial.

At the close of the case and upon motions to direct the verdict, the trial court, although he permitted the verdict to stand, was in great doubt upon the question of contributory negligence and took the verdict in order that the matter might be fully disposed of if there was an appeal to this court.   In disposing of this motion the court said:

"Unless the plaintiff, Swanson, was guilty of more than a slight want of ordinary care contributing to his injury, he is entitled to recover.   The jury found in plaintiff's favor on that question.   I am not unmindful of the cases in which it has been held that want of ordinary care in approaching a railroad track amounted to more than a slight want of ordinary care.   However, it does not seem to me that the situation in any of those cases was just like the situation in this case.   Here the evidence as to what plaintiff did is not in dispute.   He was mindful of his danger and he exercised some care.   I think that the finding of the jury that there was not more than a slight want of ordinary care on

the part of the plaintiff was a result that they might reasonably reach from the evidence, and that such finding ought not to be set aside by the court."

No doubt all right-thinking people are sympathetically moved by the situation of the plaintiff in this case. He was sixty-three years of age at the time of the accident and was earning about $130 a month. The constant moving of cars over the tracks in question constituted a hazard from which persons crossing them were constantly in peril, but the entire situation, including the method of work, the number of cars which passed back and forth over the tracks daily, the whole situation was fully within the knowledge of the plaintiff at the time in question. The engine was engaged in pushing eight or ten cars onto a dock beyond that on which the plaintiff worked. A man was on top of the head car but not in a position to warn the plaintiff in the latter's situation. The plaintiff did hear the man yell just before he was struck. It was then too late for the plaintiff to avert the disaster and equally too late for the servants of the defendant to stop the train.

By the statement of the plaintiff he mounted his bicycle at a point 59.8 feet from the track on which he was injured, at a point where he was unable either to see or to hear the movement of the cars in question. The observation made by him at that point afforded him no protection whatever from the train, which was then a short distance from the crossing and in motion. He rode through a narrow passageway fourteen feet in width the entire distance, and did not dismount when he reached a point beyond the cars standing on the Northwestern Fuel Company tracks next to the Terminal track. He looked to the right and then to the left and then was struck. It seems to us indisputable that he failed to look at any point where the view would afford him the slightest protection. There was ample space between the fourth Northwestern Fuel Company track and the track on which

he was injured for him to have stopped in a place of safety at a point where he could see and observe what if anything was being done upon the tracks which he still faced. He did not do this. Failure to make such an observation has been many times held to be more than slight want of ordinary care. Ordinary care in approaching and crossing a railway track upon which there are or may be rapidly moving trains involves the use of a considerable degree of caution. The act of the plaintiff in attempting to make the crossing in the manner in which he did at the time and place in question was merely taking a chance that at that particular moment no moving car would be upon the track. He admits that at the point where he started he could neither see nor hear, although it is undisputed that the train was at that moment upon the Terminal track and in motion. The trial court put his finger upon the only possible distinction that can be made when he said that the plaintiff exercised some care and that the situation in this case was not exactly like the situation in other cases. That statement applies to almost every case. Whatever dangers were inherent in the situation were all known to and appreciated by the plaintiff, and if the crossing was highly dangerous it required a corresponding degree of care on the part of one who knew the danger. To say that the failure of the plaintiff to exercise ordinary care is in this case no more than slight want of ordinary care is to say that one may proceed without taking any precautions or exercising any care at a time and place when and where the exercise of that care may enable him to avoid injury. The plaintiff testified that he could stop his bicycle instantly. If he had stepped from it for a single moment at any point beyond the overhanging of the cars on the fourth Northwestern Fuel Company track, the disaster would have been averted. Under these circumstances the plaintiff was guilty of contributory negligence which defeats his right to a recovery. *Roth v. Chicago, M. & St. P. R. Co.*

185 Wis. 580, 201 N. W. 810; *Baltimore & O. R. Co. v. Goodman,* 275 U. S. 66, 48 Sup. Ct. 24; *Dax v. Chicago, M. & St. P. R. Co.* 185 Wis. 432, 201 N. W. 736, and cases cited.

*By the Court.*—Judgment is reversed, with directions to dismiss the complaint.

The following opinion was filed December 10, 1929:

CROWNHART, J. (*dissenting*). I regret my inability to agree with the opinion in this case. I feel that the decision usurps the right of trial by jury guaranteed by our constitution. That the question as to whether the plaintiff was guilty of contributory negligence was for the jury, seems to me plain. That was a fact to be determined by applying the test as to what care the great mass of men would have exercised under the same or similar circumstances, or the test as to what would the ordinary, prudent man have done under the same or like circumstances. And who is better qualified to answer that question than a jury, selected from the great mass of men by a jury commission, appointed by the circuit court. The jurors are required to have, and have, these statutory qualifications: they must be citizens of the United States; electors of this state; possessed of all their natural faculties; must not be infirm or decrepit; they must be persons esteemed in their communities as persons of good character, approved integrity, and sound judgment; they must be persons who are able to read and write the English language understandingly; and any person who has been convicted of any felony is excluded from the jury. Secs. 255.01 and 255.02, Stats. Thus, jurors in this state are highly qualified as triers of fact.

This court is highly trained in the law, but its experience in the many hazardous walks of the masses of the people is much more limited than that of jurors. This court accu-

rately expressed my thought when it said, in *Warden v. Miller,* 112 Wis. 67, 87 N. W. 828:

"A conclusion of negligence, of course, involves a comparison of the conduct under consideration with the conduct of the great mass of mankind under like circumstances. This standard must rest in the experience and observation of the individual or individuals who are to make the comparison, and in the ordinary affairs of life it is beyond question that men selected from the various professions and employments of life to sit upon juries are quite as able to correctly form and apply that standard as are men whose experience is confined to a single profession."

Lord Justice SCRUTTON voiced the idea with keen insight, speaking of certain labor decisions, when he said:

"The habits you are trained in, the people with whom you mix, lead to your having a certain class of ideas of such a nature that when you come to deal with other ideas, you do not give as sound and accurate a judgment as you would wish. . . . It is very difficult sometimes to be sure you have put yourself into a thoroughly impartial position between two disputants, one of your class, and one not of your class." 1 Cambridge Law Journal, 6, 8.

Lord Justice SHAW has expressed the idea that judges are not free from prejudice, which, after all, is merely a preconceived opinion on certain matters that tend to foreclose the mind from taking the impartial view so necessary to justice. He said that *invidia* (prejudice) has a much more subtle hold over the mind of a judge than over the mind of a jury, and, said he: "I have often thought about this and I speak from a long experience." Letters to Isabel, p. 33. Both Lord SCRUTTON and Lord SHAW are justices of great eminence on the court of last resort for the British Empire.

I feel very keenly my own inability to accurately judge the degree of care that the ordinarily prudent workman uses when passing along on a bicycle over a highway through a

tunnel of rail box cars standing on both sides of the highway on five parallel tracks, and especially the care exercised ordinarily by hard-working men, sixty-three years of age, after a hard day's work, going to their homes hungry and tired. I am content to take the verdict of a jury that naturally know more about such working conditions than I do, except in very clear cases where there is no credible evidence to support the verdict. I think it cannot be said that this is such a clear case. Indeed, I think this is a typical case for a jury verdict. Here there was a highway over which a large number of workmen passed daily in going to and from their work on the coal dock. It was crossed by seven parallel railroad tracks, close together, and on the day in question these tracks, with one exception, were filled with standing cars which left only fourteen feet of the highway clear. Naturally such a highway forms a rough, uneven track for a bicycle. The plaintiff, sixty-three years of age, a workman on the dock, at the close of his day's work took his bicycle near the crossing tracks to depart for his home. He first carefully listened for any bell or other noise indicating any movement of the cars on these tracks. He heard nothing; he looked both ways along the tracks; he saw nothing to warn him of danger. The law required the engine bell to ring; it did not ring. He had a right to rely on the bell being rung, for such is the law. He had no reason to believe that the railroad company would spring a trap on him. He mounted his bicycle and proceeded along the center of the highway slowly across the tracks. As he proceeded he looked to his right and to his left and listened for any train movement, and saw and heard nothing to warn him of danger. His vision was obscured by standing box cars close together within seven feet of him on either side. Suddenly, as he approached the fifth track he saw cars approaching from his left, rolling silently, swiftly along, with the engine at the far end of the train, pushing

them. He tried to escape, but he was too near before he observed the oncoming cars, and he was run over, losing both legs. I think our common sense tells us that a sober, industrious workman does not court that kind of danger. There should be a presumption of law, and I think there is, that the ordinary man in such a situation uses ordinary care to preserve his life and limbs. I think this plaintiff used such care. I reach that conclusion not only by reason of the presumption mentioned, but by the uncontradicted facts in the case. Had this court sat as a jury, seen and heard the witnesses, been familiar with the crossing in question, and had we observed from time to time how swiftly and silently these cars move along, it is not improbable that we would have been of the same mind as the jury.

Referring again to the opinion of this court in *Warden v. Miller, supra,* I quote:

"The standard of ordinary care exercised by farmers in the necessary act of burning the refuse from marsh lands in a particular part of the state is, of course, far better known to a jury of the vicinage than it can be to us. If, therefore, there is any credible evidence of any precautions against injury resulting from the doing of such acts, it is peculiarly appropriate that we should refrain from setting aside the conclusion of such a jury that such acts do or that they do not coincide with the care ordinarily exercised."

Following this clear illustration of the principles to be applied in jury trials, I think it is apropos to say: the standard of care of these coal-dock workers, in their necessary travel over the public highway in question, in the particular situation of this crossing, of course is far better known to a jury of the vicinage than it can be to us.

The court, in its opinion, says:

"To say that the failure of the plaintiff to exercise ordinary care is in this case no more than slight want of ordinary care is to say one may proceed without taking any precautions or exercising any care at a time and place when

and where the exercise of that care may enable him to avoid injury."

In other words, the court holds that the plaintiff did not exercise any precaution or care for his safety. How can this be true in view of the uncontradicted evidence that plaintiff looked and listened when only seven feet distant from the point of entry on the tracks, and fifty-nine feet distant from the point of injury; that he rode slowly and continued to look and listen, but was prevented by the cars blocking the highway on either side from seeing until close to the passing track? Had the bell rung as the law required, he would have heard it before he started, and continuously thereafter. But it did not ring. Then what more could he have done save to look and listen? Having started on his journey, the matter was not so simple as indicated by the opinion. He not only had to look out for cars on the passing track, but cars might move either way on any one of the other tracks, and these he had to watch, which he did. His only safe course was to look to the right and to the left, to listen, and to keep going to get out of danger.

The measurements between the tracks, as given by the court, is from center to center of the tracks, but that does not disclose the true situation in which the plaintiff found himself. The fact is that the distance between the cars on the first and second tracks, as he crossed them, was only four feet one inch; between the second and third tracks six inches; between the third and fourth tracks two feet nine inches; between the fourth and fifth tracks four feet two inches. At no point after the plaintiff entered upon the tracks had he a safe place to stop to look and listen. He stopped, looked, and listened just before he entered the crossing. Then, as he entered, he had cars to the right of him seven feet distant, and cars to the left of him seven feet distant, any of which were liable to move toward him. He had tracks in front of him and tracks behind him. His

only safe course was to keep going, watching as he did, first to one side and then the other. As he came to the fifth track, where he was injured, he looked first to his right, which was his fatal error, for had he first looked to the left he might have seen the messenger of death silently coming to his ruin. But he had no way to know from which direction the cars might come, and he was guilty of no negligence in looking first to his right instead of to his left. Had the plaintiff not been incumbered with his bicycle, the situation would have been different. He had a right to ride upon his bicycle on this public highway. But the whole situation was for the consideration of the jury. They could not judge from one single fact, but only from all the related facts.

The verdict of the jury had the earnest consideration of the trial judge, and upon mature reflection he approved the verdict. I think he was well within the law and the facts in so doing.

This court, in an earlier day, established the rule that where the facts were such that reasonable men might differ as to the inference of negligence to be drawn therefrom, they presented a jury question. That rule seems to have been neglected of late, though it has never been overruled. Probably we have been prone to overlook it by reason of the pertinent suggestion of Mr. Justice WINSLOW, joined in by Mr. Justice DODGE, in the dissenting opinion in *Agen v. Metropolitan Life Ins. Co.* 105 Wis. 217, 80 N. W. 1020, to the effect that such a rule might be considered an invidious reflection on the minority which differed from the majority as to the inference to be drawn from the facts of the case. There Mr. Justice WINSLOW said:

"It is said in the opinion of the court in the present case that, if there is room for a reasonable inference under the evidence inconsistent with the theory of suicide, the case was one for the jury. This is but another way of express-

ing the principle that, if reasonable minds viewing the evidence may differ in their conclusions therefrom, the question should be submitted to the jury. Two members of this court, as well as the trial judge and the jury, who saw and heard the witnesses, have reached a different conclusion as to the inferences fairly deducible from the evidence from that reached by a majority of this court. Is it not an extreme statement to say, as is said in the opinion, that 'different minds cannot reasonably come to different conclusions from the evidence?' "

I think the verdict of the jury is well supported by the evidence and should be sustained.

A motion for a rehearing was denied, with $25 costs, on February 4, 1930.