TULLY, Respondent, vs. PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant.

*April 9—May 7, 1940.*

For the appellant there was a brief by *McConnell, Schwei-zer & Fuller* of La Crosse, and oral argument by *H. V. Fuller*.

For the respondent there was a brief by *George H. Gordon, Law & Brody* of La Crosse, and oral argument by *Lawrence J. Brody*.

ROSENBERRY, C. J. The insured, Thomas J. Tully, was at the time of his death, November 4, 1938, forty years of age. He was married to the plaintiff on June 27, 1936. He had been down to a short time prior to his death in the employ of the Singer Sewing Machine Company, for some time as manager of the company's business in the La Crosse district. In 1938, he was transferred from La Crosse to Madison. He did not like the Madison appointment and was considering entering the services of the company at Green Bay, at the time of his death.

For some time prior to his death the deceased had been suffering from pernicious anemia. Upon the trial the physician who treated him testified that the disease was yielding to treatment, and while the deceased would have to be careful and continue treatment there was no reason why he might not have lived for a good many years so far as his health was concerned.

On Tuesday, the 1st day of November, 1938, the deceased borrowed a gun from a friend, Mr. Mueller. On Friday morning, November 4th, Mrs. Tully attended church service at 7 o'clock. Upon her return home the deceased then left to attend the 8 o'clock service. Upon his return from the service, the family had breakfast and the deceased announced his intention of returning the gun which he borrowed. The deceased had planned to go hunting on Friday with Fr. Robert McCarthy, the priest in the parish in which the deceased lived. There was a heavy rain on Thursday, the hunting trip had been given up, and because of that the deceased was

returning the gun. It had been kept in the living room under a sofa or settee. He took it out, placed the gun in his car, and went down town where he met Edward L. Dugan, his brother-in-law, at the corner of Fourth and Main streets. Dugan told him he was going to make a call on North Twenty-Fourth street, and deceased offered to drive him out in his car. They were to meet in front of the Batavian Bank where the deceased went for the purpose of changing the terms of payment of a policy from a lump-sum payment to his wife to one providing for monthly instalments, payable to her for ten years, and in case of her death, to his children. After making the call on Twenty-Fourth street, the deceased with his brother-in-law returned to the home of the deceased. On the way the deceased stopped to purchase oranges for his baby, and when he and Dugan reached the home of the deceased, he drove the car into the garage and Dugan shut the doors. They then went into the house where they played with the baby, Dugan remaining about twenty minutes. When Dugan left to make some other calls somewhere around 11 o'clock, deceased told his wife that he was going to dispose of the ashes in the basement. While she was preparing food for the baby and giving the baby a bath the deceased went out through the kitchen and this was the last time that the plaintiff saw him alive. Having fed and bathed the baby she went out to inquire when her husband wanted luncheon. She went to the garage about five minutes before twelve and found him lying dead on the garage floor. The garage faced south. He was lying between the car and the east wall of the garage, a space of some twenty inches or two feet, his head pointing toward the door of the garage lying near the rear of the car.

It appears without dispute that at the time the gun was taken from the house it was disassembled and in a short canvas case, each of the two sections of the gun being inclosed in separate pockets. The gun was a model 12, 12-gauge shot-

gun, manufactured by the Winchester Repeating Arms Company, and shipped by the company on June 3, 1925. The gun consisted of two parts, the receiver and the butt end, and the second part, the barrel, magazine, and forearm. It appears that the gun was in good condition; that it had a trigger pull of at least four and one-half pounds. A factory expert testified that it could not be discharged unless the trigger was pulled. There was evidence that the owner discharged the gun once while pumping it, but just under what circumstances it does not appear nor does it appear what caused it to be discharged. When the gun was found, after the death of deceased, it was lying on the floor of the tonneau back of the front seat pointing out toward the open door near where the deceased was found. There was a single discharged shell in the barrel of the gun. The expert testified that the gun could not be disassembled with a shell in the magazine or in the barrel. This testimony is not contradicted by evidence to the effect that when the gun was disassembled with a shell in the barrel, the shell is retained in the butt end of the gun and projects more than half the length of the shell beyond the end of the butt so that it is in plain sight.

Police officers were notified, and a thorough search was made to discover in what manner the gun was discharged. The search revealed no string, sticks, or other objects by means of which the gun could have been discharged, nor was anything discovered upon which the trigger of the gun might accidentally have caught. There was no post-mortem, but the evidence of the undertaker was to the effect that the muzzle of the gun must have been close to the body. The charge was received to the right of the sternum and opposite the third vest button. The charge pierced the body horizontally and lodged in the spine, according to the testimony of the undertaker.

There was no evidence in the case to indicate that the deceased had ever disclosed any suicidal tendencies nor does it

appear that he was despondent. His domestic relations in all respects were happy and pleasant. He was not in debt. His troubles, if he had any, related to his position with the Singer Sewing Machine Company where because of ill-health or some other reason he apparently had been demoted. There was nothing to indicate that the company had any lack of confidence in him as they were willing to continue him in their employment in a different capacity.

We are asked to say upon this appeal that the verdict of the jury finding that the deceased did not commit suicide is not supported by credible evidence. It was the view of the trial court that the verdict of the jury was well supported. The decision of the trial court in that respect is not to be disturbed unless from an examination of the record it appears that the determination of the trial court was clearly erroneous. *Agen v. Metropolitan Life Ins. Co.* (1900) 105 Wis. 217, 226, 80 N. W. 1020. On the other hand, if upon consideration of the entire evidence it points to suicide as the cause of death with such certainty as to leave no room for reasonable controversy on the subject, that is, that the minds of reasonable men can come to but one conclusion upon the evidence, the verdict of the jury should not be allowed to stand. *Agen v. Metropolitan Life Ins. Co., supra.*

In this case the plaintiff proved that the death was caused by a gunshot wound in the chest of the insured. The policy provided, so far as material in this case, for the payment of an accidental death benefit of $2,500 immediately upon receipt of due proof of accidental death as defined in the policy—

"and that such death occurred within ninety days of the accident, provided, however, that no accidental benefit shall be payable if such death resulted from suicide, while sane or insane."

The plaintiff having established the fact that the insured died from a gunshot wound, the law presumes that the

wound was inflicted accidentally, which presumption will prevail in the absence of evidence sufficient to establish suicide to a reasonable certainty. If the insurer is to escape liability the burden is upon it to produce the evidence which establishes suicide. The burden is not upon the plaintiff to establish to a reasonable certainty that the insured did not commit suicide. The presumption of law aids the plaintiff in that regard, and while the presumption is rebuttable, it is only rebutted by the production of evidence which establishes the fact of suicide to a reasonable certainty.

In reversing the judgment of the trial court in *Agen v. Metropolitan Life Ins. Co., supra,* the court said:

"It is considered that the evidence shows that Griffin [the insured] intentionally destroyed his life, that such fact appears with such clearness as to leave no room for any other reasonable hypothesis, that the motion for the direction of a verdict should have been granted, and failing in that, the court should have set aside the verdict and granted a new trial. In reaching this conclusion full effect has been given to all legal presumptions in plaintiff's favor, and the rule that the burden of proof was on the defendant to satisfy the jury, by a preponderance of the evidence, that Griffin died by suicide."

We have carefully examined the evidence in this case. There are some circumstances which point to suicide. The fact that the gun was disassembled when taken from the house, that the deceased assembled it after he left the house to dispose of the ashes, that he must have intentionally inserted a cartridge in the chamber of the gun which could not have been done accidentally; that there was no other apparent object or purpose in assembling the gun and loading it than to use it for the purpose of inflicting the wound are indications which might lead one to the conclusion that the deceased committed suicide. On the other hand, it was Friday, the deceased had attended church services, he had gone with his brother-in-law to call, had purchased oranges for his

child. He never at any time had disclosed in any way suicidal tendency. He was prosperous, happy in his home, and while he was suffering from ill-health there was nothing immediately alarming about that or anything that should have given him great concern.

After giving the evidence careful consideration we are unable to say that it establishes suicide with such certainty that the minds of reasonable men can come to but one conclusion upon the evidence. If upon the whole case the evidence was subject to two inferences, and the jury was in doubt as to which one should be drawn, the defendant had not met the burden of proof and the jury correctly answered the question.

Other errors are assigned which we have considered and which we do not think under the circumstances are necessary for us to discuss. The charge of the court to the jury when taken as a whole was correct and fairly and impartially given. Complaint is made because the plaintiff was allowed to tax $100 attorney fees under the provisions of sec. 271.04 (1) (a), Stats. It is true that the amount of the recovery in this case was for the instalments on the policy due at the time, which amounted to but $197.04. The question involved was the liability of the company upon the agreement to pay accidental-death benefits. In respect to this the company denied liability so that while there was but $197.04 due at the time, the recovery was in legal effect a sum amounting to $2,500. The statute reads:

"When the amount recovered or the value of the property involved is one thousand dollars or over, the costs (exclusive of disbursements) shall be one hundred dollars. . . ."

The recovery in this case was the amount due on the policy although it is not presently payable. It is considered that the sum of $100 attorney fees was properly allowed.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J. (*dissenting*). Preparation for an act is evidence of intent to carry it out. Testimony as to the behavior of the deceased up to the time of his leaving the house and telling his wife he was going to remove the ashes does not disclose any plan to commit suicide, but from that moment on his actions indicate a plan and purpose to destroy himself. The gun was assembled, loaded, and discharged. No occasion for assembling it existed other than the use to which he put it. The evidence, to my mind, shows conclusively that the final act was wilful.

I am authorized to state that Mr. Justice FRITZ concurs in this dissent.